WILLIAM H. FROST, APPELLEE, V. ELMER SCHINKEL ET AL., APPELLANTS: RUDOLPH J. SUCHAN ET AL., APPELLEES.

FILED OCTOBER 29, 1931. NO. 27641.

*C. M. Skiles, George W. Wertz* and *Dolezal, Mapes & Johnson,* for appellants.

*Cook & Cook, E. S. Schiefelbein* and *Courtright, Sidner, Lee & Gunderson, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

PAINE, J.

This is an action for injunction, brought in the district court for Dodge county by William H. Frost as plaintiff against Elmer Schinkel, the tenant and vendee, Ernest M. Nelson, vendor, Rudolph J. Suchan and the Dodge State Bank, holder of a chattel mortgage, in which the plaintiff asks that the defendants be restrained from selling, incumbering or removing 41 different fixtures, hereinafter set out, which were installed in a garage. Answers and replies were filed, and to a petition of intervention by F. D. Haldeman issues were also joined. By agreement of the parties all extraordinary remedies were dispensed with

and a trial had to the court on the merits, and a decree was entered May 31, 1930, finding that all of the machinery set out in plaintiff's petition was attached to the real estate and was a part of it and constituted fixtures, to all of which the defendants excepted and filed a motion for a new trial, setting up, among other things, misconduct, accident, surprise, and that the judgment was not sustained by sufficient evidence and was contrary to law.

The facts as disclosed in the evidence showed that Joseph C. Vosacek and his two sons-in-law, Edward Chudomelka and his brother, Frank Chudomelka, built and owned a new two-story tile and brick garage building, 60 by 140 feet, valued by some at $24,000, and also owned and conducted the general garage business therein.

That upon November 17, 1921, they gave a real estate mortgage upon this property, being described simply as lot 7, block 4, town of Dodge, Dodge county, Nebraska, in the sum of $9,000, payable three years after date, and that the same was given to Julius W. Frost. Upon failure to pay the same, petition for foreclosure was filed by the guardian for said Julius W. Frost, who had become an incompetent after the mortgage had been given him. The sheriff sold the premises to the plaintiff guardian, who bid in the property for $9,000; said sale was confirmed on December 1, 1925, and upon appeal to this court mandate was entered March 15, 1927, affirming same. Upon March 30, 1927, the guardian of his incompetent father deeded the property to the plaintiff in the case at bar.

The plaintiff, having become the owner of said lot 7, in block 4, under the sheriff's deed, claims to have taken possession of the garage and also all of the machines and equipment therein, claiming to be the owner thereof by virtue of the foreclosure of the real estate mortgage.

On September 29, 1928, a stipulation was filed by the parties to this injunction suit, agreeing that the fixtures in dispute could be sold by Schinkel, the tenant, to the intervener, F. D. Haldeman, the property to be left in the building and the $7,181.01 paid to be held in escrow by a bank at Dodge, Nebraska, to abide the final decision of this case.

William H. Frost, the plaintiff in the case, testified that he lived in Lincoln, and was in the finance business, and had made the real estate loan on the garage for his father. The front part of the garage was used for storage, accessories, office, and show-room. Most of the equipment in question was in the repair shop in the back room. The second story was used in part for storing cars and as paint shop and for other purposes.

An itemized statement attached to the petition gives a list of the 41 articles claimed by plaintiff as conveyed under the real estate mortgage, as follows: (1) One lathe, shop number 206; (2) Fox No. 10 improved lathe key seating attachment; (3) one power drill; (4) one Universal axle stand, model "F," No. 451; (5) one small vise, attached to bench; (6) one grinder, attached to bench; (7) one Yankee drill, No. 1005; (8) one brake band riveter, type A668; (9) one air compressor, belted to the line shaft; (10) one power saw, also belted to the line shaft; (11) one forge, attached to the stovepipe; (12) one suction fan or blower; (13) one 20-ton press machine, No. D06217; (14) one burning-in stand, No. 15-C; (15) one Ford motor, No. 19120013, to propel the same; (16) one U. S. automatic air compressor, No. H-34, DeLuxe; (17) one emery stand, belted to the line shaft; (18) one 5-horse electric motor, attached to the ceiling, to drive machinery; (19) one "U" track, attached to the ceiling; (20) one small ton hoist; (21) one large two to five ton hoist; (22) one 26-section radiator; (23) two 8-section radiators and one 19-section radiator; (24) one hot water heater and tank; (25) one lavatory; (26) one shower bath complete; (27) one 24-section radiator; (28) one large pressure tank; (29) two 20-section radiators, disconnected, low type; (30) one 18-section radiator, high type, also disconnected; (31) 15 or 20 pieces of gas pipe; (32) one sink located near wash rack; (33) one tank located in southeast corner of storage room; (34) one small elevator, complete, used for handling small packages or passengers; (35) one large elevator, complete, to take automobiles to second floor; (36) one Echo air machine, No.

52353; (37) one Volcker visible gas pump; (38) one self-measuring gas pump, type 577, model 25, serial No. 16987; (39) eight wall radiators in storage room; (40) one 25-section upright radiator in storage room; (41) one toilet complete, with 11-section radiator.

The plaintiff's evidence was supported by a friend who was also engaged in the loan business and testified at length. Joseph C. Vosacek, who was the first signer of the real estate mortgage but not a defendant in the case, testified that he lived in Dodge and was in the tire repair and battery business for six years before constructing the garage building; was at one time part owner of the lot and garage known as Vosacek & Chudomelka garage. After this new building was built, he had moved all his machinery and tools and appliances from the old place over to this new garage. As to the lathe, valued at $600, which the plaintiff claims as a fixture, he said it was in his old garage and there was practically no installation, only set it on the floor and then lined up the line shafting to it. It weighed about 1,400 pounds; could be moved out of the building without any injury to the building or without any injury to the lathe itself.

The Universal axle stand, the U. S. automatic air compressor, the burning-in stand, the Ford motor to propel it, and the grinder attached to the bench were not in there when he gave the mortgage and were installed after he sold out. The Yankee drill was simply attached with a thumbscrew under the bench. The line shaft was hung on brackets and the brackets bolted to 2 by 12's running cross-wise of the line shaft and those 2 by 12's screwed to cross-beams. The five-horse electric motor was attached on a platform built on 2 by 4's and the motor was bolted to these planks. He said it would not injure the building in any way to remove this motor or the line shaft. If the track the hoist ran on was removed it would leave a few holes in the joist where the spikes were taken out. All the articles claimed by plaintiff could be used in any garage. Upon cross-examination the witness was asked: "Q. Of course it wasn't put in the mortgage, that is true; but isn't

it a fact that you told Mr. Frost in the presence of Mr. Sigler and his son and Mr. Craven, an attorney of Lincoln, at your place of business in Dodge on January 4, 1930, that you had told Mr. Frost while you were talking about him loaning you this money that this machinery and the repair shop and these fixtures were part of the business and part of the garage? A. Well, they were. Q. Well, didn't you tell him that? A. I told him that it belonged to the business."

Ernest M. Nelson testified he was cashier of the Leigh State Bank and arranged a trade for the garage, his exchange contract, exhibit 10, showing that the building was valued at the time of his trade at $24,500, subject to a first mortgage of $9,000 and a second mortgage of $6,500, but the deal was later rescinded. The garage business was sold to Schinkel about April 1, 1926.

Frank Chudomelka testified on direct examination that he was interested in the garage with Mr. Vosacek and was around there when the machinery was moved in. He said the machinery could be used for various purposes. Any blacksmith or farmer could use the forge and the turning lathe could be used in any machine shop.

Rudolph J. Suchan, a defendant and appellee, lives in Omaha now and is in the real estate business. He lived at Dodge from November, 1925, to May, 1928, and was cashier of the Dodge State Bank. When Mr. Nelson sold the property to Mr. Schinkel, witness credited the money he got from stock on Chudomelka's second real estate mortgage of $6,500. He was agent to collect the rents for Mr. Nelson. He talked with Mr. Frost after he got the deed to the garage and Frost said he had bought everything, tools and machinery and building, and claimed that property, and witness said he told Frost that he had no claim to any tools, and that plaintiff claimed he wanted to get even with Mr. Nelson and that he was going to claim the machinery if nothing else. Witness said he agreed to pay $100 and Nelson paid $100 and he sent a draft for $200 to plaintiff, Frost, to settle his claim to the equipment claimed in this suit. Upon rebuttal the plaintiff positively denied all of this.

Defendant Elmer Schinkel testified on direct examination that he lived at Leigh and bought the stock of accessories, some tires and the shop equipment in the garage of Nelson. He testified that he had purchased and installed many of the 41 items of equipment in dispute. The small hoist was discarded and replaced with a new one. He does not claim the lavatory or shower bath which are in a room upstairs that was used for a training room by the wrestler, Joe Stecher. He claims that the Volcker visible gas pump is the property of the Dodge Oil Company. The gasoline pump No. 577 belongs to the Standard Oil Company. Schinkel gave a chattel mortgage for $6,000 to the Dodge State Bank upon stock, machinery, lathes, tools, etc. This mortgage was filed in Dodge county. Upon March 31, 1926, Schinkel gave Ernest M. Nelson a chattel mortgage upon the large lathe for $500.

1. This brief sketch of what the bill of exceptions contains indicates that nearly every phase of the subject of fixtures is involved. It discloses that fixtures have been attached to the building before and after the giving of a real estate mortgage; that a tenant to whom the garage was later rented added equipment to the plant which is now claimed to be of a permanent character, as well as some equipment purchased on instalment payments and under sales contract, or under rental arrangements, as gasoline tanks, and in addition thereto a bank has during a portion of the time held a chattel mortgage of $6,000 upon nearly everything now claimed to be a fixture; that, because of the sheriff's sale under the real estate mortgage of $9,000, the plaintiff claims the garage, which cost $24,-000, and also each and all of the 41 items above mentioned belong to him as a part of the realty, and the trial court agreed in the main with the claims of the plaintiff.

There is a great confusion by text-writers in the definition of the term "fixtures." It is held to denote such articles of a chattel nature as, when once annexed to realty, may not be removed by the party annexing them as against the owner, and, on the other hand, some courts have held just the reverse to be the true definition, that is, chattels

which are annexed but which may be removed. *Fechet v. Drake*, 2 Ariz. 239, 12 P. 694.

A distinguished authority upon real property in a lecture to law students defines a fixture as a chattel brought in and upon and annexed to real property, which retains· its separate identity and becomes realty, but which under certain circumstances may become personalty again.

2. In *Hallen v. Runder* (1834) 1 Cromp. M. & R. (Eng.) *266, *276, opinion by Baron Parke, it was held in effect that the term fixture is used more generally with reference to such inanimate things of a personal nature as have become fixed or annexed to realty, but which may be severed, disunited or removed by the party, or his personal representatives, who has so affixed them without the consent of the owner of the freehold.

"Fixture" necessarily implies something having possible existence apart from realty, but which may by annexation be assimilated into realty. *Gaspee Cab v. McGovern,* 153 A. (R. I.) 870.

Ewell on Fixtures (2d ed.) p. 1, says: "There is, perhaps, no other legal term which has been used in so many differing and often contradictory significations as the term 'fixtures.'" And adds: "The term 'fixtures,' however, seems generally to have been used with reference to articles which, in and of themselves, and irrespective of annexation, real or constructive, to land, are of a chattel nature, and which have been either actually or constructively affixed either to the soil itself, or to some structure legally constituting a part thereof."

That one may realize why courts and counsel may well be pardoned for the confusion arising in passing upon questions relating to this subject, the Iowa court declared many years ago: "Fixtures are a species of property which are the dividing line between real and personal property, and to decide on which side of the line certain property belongs is often a vexatious question." *Ottumwa Woolen Mill Co. v. Hawley* (1876) 44 Ia. 57.

Judge Lynch, in *Re Trevey*, 14 Law Times Rep. n. s. 193, says: "Perhaps there are no subjects in law more diffi-

cult to deal with than the questions raised as to fixtures. * * * The cases are legion; and each new case seems only the more to disturb any fixed or certain rule that seemed deducible from former cases." See 26 C. J. 653.

Therefore we approach the many close questions involved in the case at bar with a full realization that decisions will easily be found contrary to our holding upon each proposition that we are compelled to pass upon, for verily we are groping along in the twilight zone between things real and things personal.

3. To one who attempts to ascertain why such confusion exists, it is of great interest to trace briefly the holdings of some of the early masters of law.

If references by text-writers indicate importance, then the 29 references in Ewell on Fixtures, being more than to any other case, and its equal prominence in tables of cases of all other text-writers upon this subject, indicate that the leading case on fixtures is *Elwes v. Maw*, 3 East (Eng.) 38, 2 Smith's Leading Cas. 189. This case, decided in 1802, in the King's Bench, concerned a tenant in agriculture who lived in the county of Lincoln, England, and had leased a farm on May 12, 1779, for 21 years, and 15 years before the expiration of the lease he erected, at his own expense, for the necessary and convenient occupation of the farm, a beast house, carpenter shop, fuel house, cart house, pump house and fold-yard wall, which buildings were all of brick and mortar and tile and let down into the ground. Prior to the expiration of his lease he pulled down all of these buildings, dug up the foundations, carried away all the materials, and left the premises in the same state as when he entered upon them, and the question before the court was: Did the tenant have a right to take away these erections? In this decision Lord Ellenborough discussed all of the leading cases up to that time, including those from the Year-books. He cited the case of *Penton v. Robart*, 2 East (Eng.) 88, in which Lord Kenyon in 1801 had held that gardeners and nurserymen might plant trees and shrubs, and in the course of their trade expend thousands of pounds in the erection of greenhouses and hot-

houses to carry on their trade in the neighborhood of the metropolis of London, and that they might remove all of these things as trade fixtures before the termination of their lease. Lord Ellenborough then made the distinction between trade and agriculture, and admitted that to encourage trade and business it might be proper to be liberal in allowing tenants to remove trade fixtures, yet he held the tenant farmer strictly responsible for the value of all of the improvements he had erected and removed from the fee.

In 1829 Justice Story delivered the opinion of the United States supreme court in *Van Ness v. Pacard,* 27 U. S. 137, which is the early guide in this country upon fixtures. In this decision Justice Story discusses the case of *Elwes v. Maw, supra,* and says that the common law of England is not to be taken in all respects to be that of America, but that in this new country which was a wilderness the universal policy was to procure its cultivation and improvement and to encourage tenants to such erections as would result in developing agriculture, and therefore his log cabin, if the English rule was adopted, would cease to be his the moment it was finished. Justice Story says that the rule of common law was never inflexible and without exceptions. "It was .construed most strictly between executor and heir, in favor of the latter; more liberally, between tenant for life or in tail and remainderman or reversioner, in favor of the former; and with much greater latitude, between landlord and tenant, in favor of the tenant. But an exception of a much broader cast, and whose origin may be traced almost as high as the rule itself, is of fixtures erected for the purposes of trade. Upon principles of public policy, and to encourage trade and manufactures, fixtures which were erected to carry on such business were allowed to be removed by the tenant, during his term, and were deemed personalty, for many other purposes."

In this case a carpenter had leased a lot in the city of Washington for a term of years and erected on that land a two-story building of brick or stone, and before the ex-

piration of his lease took down and removed said building from the premises. A portion of this building was used as a residence, but, as a carpenter, he had tools and two apprentices in the house and a workbench outdoors. In addition, he conducted a dairy business, assisted by members of his family, in the basement, where there was a spring, and the utensils for this trade or business were also in the building removed. It was argued that this brought him within the liberal rule for trade fixtures adopted in *Elwes v. Maw, supra.* Judge Story found that the purported carrying on of two trades was not to conceal the fact that it was used in part for a dwelling and saw no reason why the dairyman-carpenter-tenant was not entitled to carefully remove the building as a trade fixture, as he did before the termination of his lease.

4. The third leading case to be considered in the study of the law of fixtures is *Teaff v. Hewitt,* 1 Ohio St. 511, 59 Am. Dec. 634. This was founded on a bill in chancery filed in October, 1849, by James Teaff against Samuel Hewitt and his judgment creditors to enjoin detaching a steam engine and boiler and carding machines annexed to the realty in a woolen manufactory. In this case Chief Justice Bartley reviews many of the cases in England, including *Elwes v. Maw, supra,* and the case of *Lawton v. Salmon,* 1 H. Bl. 259, in which Lord Mansfield in 1782 discussed the same question as between an heir and an executor respecting salt pans and other articles connected with the salt works, but held them to pass with the realty because they were accessories to the freehold. Judge Bartley in this early Ohio case then reviews all of the important cases in this country and states that the doctrine of fixtures is involved in no inconsiderable degree of uncertainty, and that the judicial decisions, while numerous, are complex and make conflicting distinctions arising out of the peculiar circumstances or relation of the parties in each particular case. He discusses the definitions of fixtures and shows that it is an error to speak of a removable fixture, although the civil law has divided property into things movable, as chattels, and things immovable, and then tells us that fix-

tures belong to that class of property which stands upon the boundary line between these two great divisions. He points out that in England heirlooms pass with the inheritance, the same as wild animals in the fields or deer in a park or fish in a pond, which could only be fixtures by constructive attachment, and in his exhaustive review of the authorities shows that from the time of the Year-books down to the time of his decision in 1853 the authorities do not give one established criterion of universal application. He shows the great difficulty of applying these decisions when millstones in a mill or a water wheel or the Ohio rail fences of his time, which were simply set on top of the ground, were all considered as fixtures, and yet could be removed without injuring the freehold in any way, and discusses the leading Massachusetts case of *Gale v. Ward* (1817) 14 Mass. 352, 7 Am. Dec. 223, in which Chief Justice Parker held that in a woolen factory machines that were even too large to be taken out of the door, but must be unscrewed and taken to pieces, were personal property.

After carefully reviewing all of the authorities up to that time, Judge Bartley states that he has reached the conclusion that the united application of the following requisites will be found the safest criterion of a fixture: "1st. Actual annexation to the realty, or something appurtenant thereto. 2d. Appropriation to the use or purpose of that part of the realty with which it is connected. 3d. The intention of the party making the annexation, to make the article a permanent accession to the freehold—this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made." To show that these three criteria have been adopted and accepted by courts generally, and that courts have appreciated the clarifying work of Judge Bartley in this decision, it will interest the bar to state that in Ewell on Fixtures (2d ed.), published in 1905, there is given on pages 28-30 a list of 158 decisions up to that date, in which this decision is relied upon, there being 22 decisions from

New Jersey, 16 from New York, 11 from Illinois, 6 from Texas and Oregon, 9 from Massachusetts, and in all it lists such cases from 32 states, the District of Columbia, Scotland, England, and Ontario. In this exhaustive opinion Judge Bartley held that the machinery of a woolen factory, consisting of carding machines, spinning machines and looms connected with the motive power of the engine by bands and straps, but only connected to the building by cleats, were chattel property, but that the engine and boiler were fixtures.

A trifle over a score of decisions in our own state pass upon troublesome questions in the law of fixtures. We will briefly refer to them.

In *Lanphere v. Lowe* (1873) 3 Neb. 131, a tenant leased a portion of a vacant lot in Omaha for five years and agreed to pay rent and taxes, and that no improvements which the tenant might erect could be removed if any rent or taxes remained unpaid. The tenant put a small building upon blocks and executed a chattel mortgage thereon, and upon failure to pay the loan the mortgagee attempted to remove the building, and an injunction was brought to prevent the removal thereof, which was tried before Chief Justice Lake, and an injunction granted. But upon appeal to this court it was held by Justice Gantt, Maxwell, J. concurring, that, the lease not having been recorded, the mortgagee had secured a superior lien upon the building to that of the owner for unpaid rent.

We find that in our pioneer days three cases of fixtures arose where small "dwellings," which could usually be easily moved between two wagons, were the subject-matter of heated litigation.

The first of these was the case of *Freeman v. Lynch*, 8 Neb. 192. In 1859 the locators of the town of Beatrice reserved from sale and intended to dedicate to the county a block for a courthouse, but failed to do it. In 1871 Daniel Freeman erected his home on this block and occupied it until 1874 with his family, and during his temporary absence the county treasurer levied upon the house for delinquent taxes upon other real estate owned by Freeman,

and the county board moved the residence into the street and sold it at auction. Chief Justice Maxwell in deciding the case held that this building was not personal property and could .not be moved before the sale, and first adopted into our Nebraska law the three requisites of fixtures announced for the first time in the case of *Teaff v. Hewitt, supra.*

We will not cite the many times the three criteria first announced in this Ohio case have been referred to by Nebraska judges, but Judge Norval announced in *Oliver v. Lansing* (1899) 59 Neb. 219, 80 N. W. 829: "The rule there stated seems eminently sound, and will be adhered to by this court." Dean Pound set them out in full in his pains-taking decision on fixtures in *Hillebrand v. Nelson,* 1 Neb. (Unof.) 783, 95 N. W. 1068.

Then followed *Dietrichs v. Lincoln & N. W. R. Co.* (1882) 13 Neb. 43, 13 N. W. 13. The material question was whether a house moved to a lot in Columbus and set on blocks was a chattel or realty. The evidence disclosed that the owner of the fee, living in New York, not only made no claim to the house, but did not know it was there at the time he sold the lot to the defendant; that the plaintiff in the replevin action had moved the house upon the lot in question a few months before under the belief that the land belonged to it, and had advertised the house for sale. The court held the house was chattel property.

In *Waters v. Reuber* (1884) 16 Neb. 99, 19 N. W. 687, it was held that, when a buyer of a lot in Aurora, Nebraska, began the erection of a dwelling upon his lot, and the former owner of the fee repudiates the sale and takes back the property, the building thereupon becomes chattel property and may be replevied by the person who built it.

5. In *Friedlander v. Ryder* (1890) 30 Neb. 783, 47 N. W. 83, we have a case in which a building erected by the tenant was in fact a substantial addition to and enlargement of an old building. It was erected under a lease which allowed the tenant to remove all buildings placed thereon during the term of the lease, and this court held that, as it could not be removed without considerable injury to the

old building, the addition belonged to the owner of the fee, as it did not come within the head of tenant's fixtures.

6. In considering when a tenant may remove his fixtures, this court, speaking through Commissioner Epperson, held in *Ogden v. Garrison* (1908) 82 Neb. 302, 117 N. W. 714, that when granaries, chicken house and blacksmith shop without foundations are erected by a tenant on a farm, he could not be restrained from moving them off the place before the termination of his lease; and in *Stevens v. Burnham* (1901) 62 Neb. 672, 87 N. W. 546, this court declared that the right of a tenant to remove a trade or agricultural fixture upon leased premises expires with the tenancy.

Commissioner Albert stated in *Fenimore v. White* (1907) 78 Neb. 520, 111 N. W. 204, that "the tenant has the right to remove the fixtures at any time before he yields possession, even though he holds over without permission of the landlord. * * * He was in possession when the temporary injunction restraining the removal of the fixtures issued. As his right to remove the fixtures was coextensive with his possession, * * * a permanent injunction forbidding the exercise of such right was properly denied."

Another removal case, *Free v. Stuart* (1894) 39 Neb. 220, 57 N. W. 991, arose over the ownership of certain greenhouses and a boiler house erected by a tenant and claimed by owner of the fee because not removed when the lease expired March 1, 1891, nor even on May 12, 1891, at which time the tenant vacated the premises. These fixtures were claimed by the holder of a chattel mortgage thereon given by the tenant during his tenancy. The trial court having decreed the foreclosure of the mortgage, a reversal was entered on the ground that the mortgagee had no greater rights than the tenant, and the fixtures could only be removed during the continuance of the tenancy.

*Grand Island Banking Co. v. Koehler* (1899) 57 Neb. 649, 78 N. W. 265, was a case in which a saloonkeeper erected a large hotel and fitted up the corner thereof with expensive built-in equipment for his saloon and then mortgaged the fee. Commissioner Ryan said: "There was a contention as to whether certain saloon fixtures were personal or real

property. We are not at all confident that we could add to public general knowledge any new or valuable information by describing the appearance or functions of what seem to be the ordinary equipments of a saloon. * * * On the evidence submitted it was found that these were parts of the real property, and we are satisfied to accept the judgment of the district court in respect thereto."

When a Franklin county farm was sold under contract and no reservations set out in the contract, it was held that corncribs, cattle sheds, hog sheds, situated upon a farm, are of the general class which a prospective buyer would have a right to assume are a part of the freehold. They are not such as to put him upon inquiry in reference thereto, even though he may know the farm is occupied by a tenant. *Roden v. Williams,* 100 Neb. 46, 158 N. W. 360, L. R. A. 1917A, 415.

To indicate the great difficulty of deciding questions relating to this subject, we find in our own reports an action over a second-hand portable engine, boiler and appliances connected therewith, which has been before this court three times, involving the question of trade fixtures. The articles in dispute were connected with a planing mill at South Omaha. Fuller was the owner of the real estate, and Silver, the tenant, gave a chattel mortgage to Brownell & Company upon these as chattels. At the expiration of the lease Fuller took possession of the premises and of the engine and boiler, and the mortgagees brought a replevin action. The first appeal is found in *Fuller v. Brownell* (1896) 48 Neb. 145, 67 N. W. 6, and was reversed because of the exclusion of testimony to prove the property had become a trade fixture. In absence of an agreement or consent of the landlord, trade fixtures cannot be removed by tenant or his mortgagee after expiration of the term. Upon its second appearance in this court, *Brownell v. Fuller* (1899) 57 Neb. 368, 77 N. W. 775, it was again reversed; and after a third trial it was again brought here, and Justice Holcomb, in (1900) 60 Neb. 558, 83 N. W. 669, reviews the evidence and the authorities and announces as a rule in Nebraska that it is a question for a jury, under

proper instructions, to decide whether the articles in dispute were trade fixtures; and as two juries had found in favor of Fuller, the owner of the lot, the case was affirmed, making the machinery a part of the fee.

From this hurried review of a few of the earlier Nebraska decisions, it is plain to be seen that fixtures are in the twilight zone between real and personal property in Nebraska, the same as they are in other states. The evidence is so sharply in dispute in this case that the appellants claim that the articles in dispute were never treated as realty by the original owners nor by the mortgagee at the time the mortgage was given on the real estate, for the property was mortgaged simply as lot 7, block 4, of the town of Dodge, and the decree, the order of confirmation, and the sheriff's deed, as well as the deed to plaintiff, each and all describe the property simply as lot 7, of block 4, town of Dodge.

The holdings of other courts have been so diverse that it is impossible to reconcile them. In *Voorhis v. Freeman,* 2 Watts & Serg. (Pa.) 116, 37 Am. Dec. 490, it was held that, whether fast or loose, all of the machinery of a manufactory which is necessary to constitute it is a part of the freehold, while it has been held that, if the removal of a boiler and an elevator did not take away or destroy any essential part of the support of the main building, they could be removed and not become a part of the real estate. See, also, *Havens v. Germania Fire Ins. Co.,* 123 Mo. 403, 27 S. W. 718, 45 Am. St. Rep. 570, 26 L. R. A. 107. In *Hanson v. Vose,* 144 Minn. 264, 175 N. W. 113, 7 A. L. R. 1573, it was held that the owner of a lease who installs gas ranges and a door bed in each flat, but thereafter forfeits his lease, will lose the ownership of such personal property, and such ownership will pass to the owner of the fee, if no rights of third parties have intervened; while the Massachusetts supreme court, in *Murphy Door Bed Co. v. New England Bond & Mortgage Co.,* 176 N. E. (Mass.) 802, held that door beds furnished to the owner of an apartment building to constitute a permanent part of the apartments constituted fixtures and were covered by a real estate

mortgage executed subsequent to the conditional sale contract under which they were sold to the owner.

7. While "fixtures" are usually thought of as personal property which have become a part of the real estate, yet a "trade fixture" is defined as personalty. In defining the term "trade fixture" we find a very concise statement in 26 C. J. 699-701, that an article may be regarded as a trade fixture if annexed for the purpose of aiding in the conduct by the tenant of a calling exercised on the leased premises, provided it is not, in some jurisdictions, exclusively agricultural in its nature. That the fixture is particularly adapted to the type of building in which it is placed does not make it irremovable.

Trade fixtures are articles annexed to the realty by a tenant for the purpose of carrying on trade, and are ordinarily removable by him during his term. Such trade fixtures are not taxable to the landlord as realty. That such a fixture must be taken to pieces or even wrecked to remove it does not exclude the right of removal. However, such removal must be made without causing substantial damage to the freehold and must be removed before the tenant relinquishes possession. 26 C. J. 699.

In *United Booking Offices v. Pittsburgh Life & Trust Co.,* 119 N. Y. Supp. 216, partitions nailed to floors and walls in an office building were held to be trade fixtures, and not a part of the realty.

Where trade fixtures placed in a building by a tenant are insured by him in a policy of insurance he will be entitled to recover thereon, even though as between him and his landlord the fixtures might be the property of the landlord. *Clark v. Svea Fire Ins. Co.,* 102 Cal. 252.

The following articles are taken from 26 C. J. 702, note, as having been held by courts to be trade fixtures: Furnaces, boilers, oil and gas well casing and machinery, electric lighting machinery, counters and shelves, flour mill machinery, laundry plant, printing presses, shafting, belts, pulleys, awnings, opera chairs, pipe organ, and a refrigerating plant in a hotel.

Courts are divided upon many trade fixtures, and one of

the most perplexing is electric fans, which may be attached so permanently as to become a part of the building or may be simply attached by an electric cord, and the holdings of the courts thereon have been gathered into a long note following the case of *Reno Electrical Works v. Ward*, 51 Nev. 291, 62 A. L. R. 247. It has been said that the installation of a pipe organ in a church or a movie theatre presents as close a question as the court may find, and the decisions have followed the rule of liberality in questions arising between landlord and tenant, where it is held to be removable, strictly a trade fixture, while between mortgagor and mortgagee it has been held to be a part of the realty. Many cases are gathered in the note following *Wurlitzer Co. v. Cohen*, 156 Md. 368, 62 A. L. R. 358. A pipe organ was held to be realty in *Rogers v. Crow*, 40 Mo. 91, 93 Am. Dec. 299.

8. There has long been a liberal interpretation of the rule that, when a tenant brings upon the leasehold what are known as trade fixtures, he is allowed to remove them with the only condition that he must not injure the freehold in making such removal. But in case trade fixtures have been placed in a building by the owner, who has given a real estate mortgage thereon, the mortgagee is entitled to claim them as part of his security. This was held as early as 1845 in *Corliss v. McLagin*, 29 Me. 115, and has been followed in England and Canada and many of the states. A variation of this situation arises when the owner of the real estate has leased trade fixtures which he has annexed to the premises or purchased the same on a conditional sales contract which has been recorded as a chattel, and in such cases it has been held that they do not become a part of the realty if they can be removed therefrom without injury. *Hill v. Sewald*, 53 Pa. St. 271, 91 Am. Dec. 209; *In re Erie Lithograph Co.*, 260 Fed. 490. Garage equipment held removable as trade fixtures in *Ray v. Young*, 160 Ia. 613, 142 N. W. 393.

On the other hand, to add to our confusion, in an old decision one of our courts held that seven years after a mortgage was executed and the mortgagor added to the

premises a boiler, a saw rig, shingle mill and planer, as they could be removed without injury to the freehold, they were not fixtures. *Choate v. Kimball,* 56 Ark. 55, 19 S. W. 108. But the great weight of authority holds, as in the case of *Wight v. Gray,* 73 Me. 297, that fixtures annexed after the execution of the real estate mortgage cannot be removed or disposed of by the mortgagor or those claiming under him without the consent of the mortgagee, and this ruling has been followed in many cases; and in the case of *Planters Bank v. Lummus Cotton Gin Co.,* 132 S. Car. 16, 41 A. L. R. 592, it was held that when such a mortgage was foreclosed the mortgagee could maintain an action on his deficiency judgment against one who had removed such fixtures from the premises.

9. In *Beatrice Creamery Co. v. Sylvester,* 65 Colo. 569, 179 P. 154, 13 A. L. R. 441, it is held that a vendor of silos who reserves the power to retake them has a superior right to the holder of the mortgage upon the real estate, and may remove them against the claim of the existing mortgagee.

In *Tifft v. Horton,* 53 N. Y. 377, the mortgagee of a boiler and an elevator was decreed priority over a prior real estate mortgage, the court saying: "The chattels have not become a part of the building; the removal of them will not take away or destroy that which is essential to the support of the main building, or other part of the real estate to which they were attached."

Where a sprinkler system was installed in a theatre building it was held that in case it was not paid for it could be removed by the contractor who installed it. *Automatic Sprinkler Co. v. Central Amusement Co.,* 189 Ia. 145, 176 N. W. 786, 13 A. L. R. 439.

In *Cosgrove v. Troescher,* 62 N. Y. App. 123, it was held that gas ranges not set in a place constructed for them but raised on four legs and connected by a chimney to the flue, are personal property as between the owner of the building and his mortgagee.

It has also been held that, when the owner of the fee who has given a mortgage thereon leases the building to a

third party and gives him the right to remove any chattels which he may attach, to be used in connection with the building, such chattels do not become a part of the realty upon foreclosure; an extreme case under this holding being *Pioneer Savings & Loan Co. v. Fuller*, 57 Minn. 60, 58 N. W. 831, where the mortgagor, pending the expiration of the year of redemption from a foreclosure sale, allowed his tenant to put in a mantel and tiling and the tenant was allowed to detach these articles if done within the year of his possession.

The rule has been declared by this court that a purchaser of land with notice of title in third persons to buildings situated thereon takes the real estate subject to the rights of such third parties in such structures. *Moore v. Moran* (1902) 64 Neb. 84, 89 N. W. 629.

As we have stated, where the owner puts in improvements the law at once raises a presumption of intention to make them a part of the land, but the same rule is not enforced as against a tenant for life or a lessee. *Tyler v. Hayward,* 235 Mich. 674, 209 N. W. 801.

Where the removal of the chattels will not materially injure the premises the vendor who retains title may assert his right against a prior real estate mortgage.

10. Senator Norris, while sitting as district judge in Dakota county for District Judge R. E. Evans, tried the case of *Edwards & Bradford Lumber Co. v. Rank* (1899) 57 Neb. 323, 77 N. W. 765, and upon appeal to this court it was held: "Where one purchases an engine with a view that it shall be placed in a flouring mill of which he is the owner, to propel the machinery therein, and he executes a chattel mortgage on such engine to secure the payment of a portion of the purchase price, he thereby evinces his intention that the engine shall retain its status as personalty, even though physically attached to the freehold by such owner, and it will be so regarded by the courts whenever the rights of innocent third persons will not be prejudiced."

The boring of a well and the piping and pump therein are held not a fixture so that payment thereof could be

enforced under a mechanic's lien. *Pillow v. Kelly*, 155 *Tenn.* 597, 296 S. W. 11.

A modification of the liberal rule in regard to tenants being allowed to remove improvements takes place in the case in which the tenant becomes insolvent, in which case the owner can prevent him from removing such improvements and apply their value upon past-due rent in spite of an agreement to the contrary. *Galbreath v. Thayer*, 147 Miss. 556, 53 A. L. R. 288. For parol exception of fixtures in conveyance see *Blake-McFall Co. v. Wilson*, 98 Or. 626, 193 P. 902, 14 A. L. R. 1275.

11. In this case the plaintiff claims the ownership in his petition to item No. 37, one Volcker visible gasoline pump, and to item No. 38, being a self-measuring gasoline pump for filling cars. Only a few cases have been published dealing with the electrical equipment and gasoline equipment in modern garages and filling stations. Gasoline pumps at a service station are held not fixtures to a building. *Service Station Equipment Co. v. Hewitt*, 282 S. W. (Tex. Civ. App.) 286. The case of *Standard Oil Co. v. Dolgin*, 95 Vt. 414, 115 A. 235, 17 A. L. R. 1218, appears to be one of the very few cases discussing gasoline tanks which have been buried in the ground. The original character of such tanks as personal property, their installation, usual for a tenant upon leasing ground, and the fact that they can usually be dug up and removed with no material injury to the freehold, has led several courts to decide that such gasoline tanks do not pass in conveyance by a warranty deed.

In *Olympia Lodge No. 1, F. & A. M. v. Keller*, 142 Wash. 93, 252 P. 121, 52 A. L. R. 795, a tenant leased a tract of ground, upon which an automobile camp and service station with trade fixtures consisting of gasoline pumps, tanks, oil containers, air compressors, toilet fixtures in the rest room, and an electric sign, were placed, but unfortunately the lease contained a provision that at the expiration of the lease the lessee agrees to quit the premises and leave all improvements thereon, which shall become the property of the party of the first part. The lease was for a term

of five years, and upon the failure of the lessee to pay the rent and taxes for the third year he attempted to remove the fixtures installed and the landlord was allowed to retain all of the fixtures. See, also, *Cohen v. General Motors Acceptance Corporation,* 152 A. (R. I.) 693.

As between prior mortgagee and conditional seller, plumbing and heating appliances wrought into and attached to realty become a part of the realty, except where otherwise provided by agreement or statute. *Greene v. Lampert,* 174 N. E. (Mass.) 669.

When articles are sold on condition that the title shall not pass until they are paid for, or some other condition in reference to their ownership or use is unfulfilled, such articles do not become a part of the realty, for an agreement reserving the right of removal would in such cases be implied. See 26 C. J. 679.

We have among the items the plaintiff claims as a fixture item No. 18, one five-horse-power electric motor attached to ceiling, used for propelling machinery.

In the leading article in the Columbia Law Review for February, 1926, entitled "Some Problems of Modern Collateral Banking," the writer calls attention to the increasing use of household equipment and electrical appliances, often only attached by electrical wiring, and says that the most intricate problems are now arising in respect to such electrical fixtures. The author sets out that certain fixed rules can be accepted. As between the parties an agreement that any fixture does not become part of the real estate is binding, and is often shown by recording a conditional contract of sale as a chattel mortgage. However, some states, he says, have refused to burden the purchaser of real estate with the necessity of examining the chattel mortgage record to determine whether certain fixtures are incumbered. See *Tibbetts v. Horne,* 65 N. H. 242, 23 A. 145; *Gas & Electric Shop v. Corey-Scheffel Lumber Co.,* 227 Ky. 657, 13 S. W. (2d) 1009, 62 A. L. R. 208. See notes *Scovel v. Shadyside Co.,* Ann. Cas. 1917B, 178.

The court finds that item No. 37, Volcker visible gas pump, was not invoiced in the sale of the fixtures, and

the testimony discloses that it is the property of the Dodge Oil Company. It is not claimed by the defendant Schinkel, and if it can be removed without damage to the freehold there is nothing in the evidence that discloses that it is a part of the realty, and the same is true in reference to item No. 38, self-measuring gas pump, type 577, model 25, serial number 16987, which the evidence discloses belongs to the Standard Oil Company.

In a late case it was held that a mortgage conveying two parcels of land, "together with all fixtures and machinery located thereon and used in connection with the operation of the sand and gravel pit," which was not recorded under the statute regarding chattel mortgages, gave the mortgagee no rights against conditional seller of machinery, where no title had passed to mortgagors. *Quincy Oil Co. v. New England Road Machinery Co.*, 174 N. E. (Mass.) 670.

In a Nebraska case articles not attached were claimed to be conveyed by the real estate mortgage, the same as the heavy lathe is in this case. It is the case of *Haver v. North American Hotel Co.* (1923) 111 Neb. 13, 195 N. W. 483, in which a real estate mortgage, given to obtain money for the construction of the Yancey hotel in Grand Island, after giving the legal description of the land, specifically set out: "* * * including all screens, curtain fixtures, window shades, wall beds, ice boxes, ranges, furnaces, vacuum cleaners, refrigerating, heating, plumbing, ventilating, gas and electric light fixtures, * * * and furniture and furnishings of every kind, *in, or that shall be placed in,* any building now or hereafter standing on said premises." This court on appeal refused to accept the contention of the defendant that the real estate mortgage was limited to such items only as would be included within the terms "buildings, improvements and appurtenances," and said: "We think, however, that a reading of the whole clause shows that the intention was not to so limit the articles to such things as would come within the meaning of the three general words. It could scarcely be contended that furniture and furnishings and such articles would

come within the term of an appurtenance. * * * It was the intention of the parties that the lien should attach not only to the building and appurtenances, but to all of the designated articles that might be placed in the building, either then or thereafter erected upon the premises."

Commissioner Pound sets out in *Hillebrand v. Nelson* (1901) 1 Neb. (Unof.) 783, 95 N. W. 1068, that the mortgage given by the Beatrice Paving & Building Brick Company, after describing the several tracts of land, provided that it should include "engines, and boilers and all machinery connected with the plant," etc. Would wheelbarrows, tool boxes, sand boxes, planks and boards pass as fixtures? Judge Pound, now Dean Pound, said: "The sole basis of the claim that the articles here in controversy are fixtures arises from the fact that articles of that kind are necessary to the effective operation of the plant. But this is far from sufficient as long as they are loose and portable, have no special or peculiar adaptation to this particular plant, and are either adapted to general use or to use with equal efficiency in any like establishment."

And in *Voorhis v. Freeman*, 2 Watts & Serg. (Pa.) 116, 37 Am. Dec. 490, soft and chilled rolls lying on the ground were held realty, but an examination discloses that there could be little dispute, for the scrivener had carefully inserted in the description, "for a lot of ground with one iron rolling mill establishment situated thereon with the apparatus attached to said establishment." See *Pyle v. Pennock*, 2 Watts & Serg. (Pa.) 390, 37 Am. Dec. 517.

Careful conveyancers can well avoid troublesome questions as to what items are fixtures as well as what chattels are bound for the payment of the debt by incorporating in the real estate mortgage, in addition to the legal description of the land, such equipment, fixtures, machines, furnishings and furniture as shall be bound for the payment of the debt.

12. In regard to the lathe, being item No. 1, which cost $600, the testimony shows it weighed 1,400 pounds and it was simply attached, if at all, by gravity, but connected to a shaft for power.

A statue, weighing three or four tons, in a courtyard, which was not fastened to its foundation except by its own weight, was considered a fixture upon the foreclosure of a mortgage. *Snedeker v. Warring,* 2 Kern. (N. Y.) 170. And conversely, where a bank safe was not attached to the building by bolts or screws, irons or nails, it was not a fixture, as such term includes only articles attached to the building. *Mecca Fire Ins. Co. v. First State Bank,* 135 S. W. (Tex. Civ. App.) 1083. Thus do the reported decisions add to our confusion.

The first requirement of a fixture, set out in *Teaff v. Hewitt, supra,* is actual annexation to the freehold. But the exceptions are numerous. Doors, windows, shutters are often hung but not fastened to a building, and at certain seasons may be stored elsewhere, yet they are a part of the real estate; and in *Roderick v. Sanborn,* 106 Me. 159, 76 A. 263, 30 L. R. A. n. s. 1189, it is held they will pass under a mortgage. Retention by gravity is sufficient. 26 C. J. 661.

It is not the mere fixing or fastening which is regarded, but the use, nature, intention. It was held that a log chain which was essential to the operation of a mill, although not fixed to the mill in any way, was a fixture. *Farrar v. Stackpole,* 6 Green. (Me.) 154, 19 Am. Dec. 201.

A carpet is not a fixture although nailed to the floor, and a key carried in the vest pocket may be a part of the realty, therefore each particular case of fixtures must be determined by its own facts and is more for the jury than for the court. A heating plant cemented into the foundation is a fixture and part of the realty and subject to a mechanic's lien. *Goodin v. Ellardsville Hall Ass'n,* 5 Mo. App. 289.

Modern decisions in both England and America are against the old common-law doctrine that the mode of annexation is the criterion as to whether slight and temporary or immovable and permanent, and there is a tendency in favor of declaring things to be fixtures which are attached to the realty with a view to the purposes for which it is held or employed. *First Nat. Bank v. Clifton Armory*

*Co.,* 14 Ariz. 360, 128 P. 810, Ann. Cas. 1915A, 1061; 11 R. C. L. 1059.

It should be a safe rule to say that parts of property which are not physically attached to realty, but which are absolutely necessary to the operation of machinery and equipment which is physically attached, become themselves governed by the same rules as that which is annexed to the freehold. And this court finds that this 1,400-pound lathe, placed therein by the owner before giving the real estate mortgage thereon, is a part of the realty belonging to the plaintiff.

13. The plaintiff under oath in his petition claims the ownership of item No. 24, hot water heater and tank, No. 25, lavatory, No. 26, shower bath complete, and No. 28, pressure tank connected with the shower. These items are disclaimed by defendant Schinkel, who testifies that they were all installed by Joe Stecher in his training rooms on the second floor. The plaintiff in his evidence has failed to sustain his claims to them as made in his petition, and the court declares they are not fixtures of the plaintiff.

We now come to the consideration of a number of items which were installed in the two-story building at the time it was erected by the owner. In *President and Directors of Ins. Co. v. Buckstaff* (1902) 3 Neb. (Unof.) 632, 92 N. W. 755, we have a case which was extremely conflicting, whether a steam heating plant and radiators were put in for temporary use or for permanent use, but the evidence disclosed that the boiler was very much larger than necessary for the heating plant, and the court found that the facts would justify the conclusion that such heating plant had been put in for a temporary use and could be removed from the building. But in the present case no such contention is made, and it must be evident to any one that the 17 radiators of the heating plant, set out as items Nos. 22, 23, 27, 29, 30, 39, 40 and 41, are a part of the realty, whether they are now connected up with the system or detached, and the same is true of No. 33, pressure tank connected with the system. It is likewise true that the item No. 41, one complete toilet, No. 32, one sink, are

realty. Elevators are installed and used in this building and would be useful whether it is used as a garage or for other lines of business. Item No. 34, one small elevator, and No. 35, one large elevator, are hereby found to be a part of the realty and to belong to the plaintiff.

After movables have become permanently affixed to the realty the mere change of mind on the part of the original owner of his intention in affixing the same cannot of itself change them to chattels as against the purchaser at sale under a real estate mortgage foreclosure. *Scovel v. Shady-side Co.*, 137 La. 918, Ann. Cas. 1917B, 178.

As soon as the building was constructed the owners of the building moved their entire garage equipment and the business which they had been conducting for six years into this building, and upon November 17, 1921, the $9,000 real estate mortgage was given thereon to the plaintiff's father. It is not clear from a careful reading of the bill of exceptions whether all of the fixtures claimed by the plaintiff were annexed to the building before the mortgage was given or after, and it is possible that some of them were purchased and added afterwards. Ordinarily it is of great importance to determine the intention of the one who attaches fixtures. Such intention is not the secret purpose of such owner, but it is that intention which should be implied from his acts. The controlling intention is that which the law deduces from all of the facts and circumstances connected with the installation of the article upon the land. See *First State & Savings Bank v. Oliver*, 101 Or. 42, 198 P. 920; *Thomson v. Smith*, 111 Ia. 718, 83 N. W. 789.

14. It has also been held by our court that the owner of mortgaged property who adds improvements believing the mortgage to be ineffective cannot defend on that ground. *Arlington Mill & Elevator Co. v. Yates* (1898) 57 Neb. 286, 77 N. W. 677.

We now come to the consideration of machinery and equipment used in running a garage business. The plaintiff testifies that the owner thereof pointed out all of these particular items to him, thereby giving him assurance of

the added security of these fixtures for the $9,000 that he was about to loan for his father, while the owner testifies that he told the plaintiff that these things were a part of the garage business, meaning thereby to hold out that they were merely trade fixtures which were removable. But where the owner of realty annexes chattels, the presumption that they should become a part of the realty renders immaterial the question as to whether they could be removed without injury, as stated in *Tyler v. Hayward*, 235 Mich. 674, 209 N. W. 801, and as between a mortgagor and a mortgagee the intent of the owner mortgagor in making the annexation can be considered only if annexation was made after the execution of the mortgage. *Planters Bank v. Lummus Cotton Gin Co.*, 132 S. Car. 16, 41 A. L. R. 592. And it is held that these items affixed by the owner and by him mortgaged are fixtures which have become a part of the realty: Items No. 2, one lathe key seating attachment; No. 3, one power drill; No. 5, one small vise; No. 7, one Yankee drill; No. 9, one air compressor attached to line shaft; No. 10, one power saw; No. 11, one forge; No. 12, one suction fan; No. 13, one 20-ton press; No. 17, one emery stand; No. 18, one five-horse-power electric motor; No. 21, one two-to-five-ton hoist.

In *Young v. Hatch*, 2 Am. & Eng. Ann. Cas. 374, many cases are reviewed, and it is held in several of them that as between the mortgagee and the mortgagor annexations affixed to an estate by the owner before mortgage, of such a character as are apparently calculated to be for the permanent use and enjoyment of the realty, are presumed to be intended to form a part of the realty and to pass with it by a mortgage.

15. The evidence discloses that the following articles were installed by the defendant, Elmer Schinkel, after he had leased the building, and the rule is that as between a tenant and a landlord the evidence should be construed liberally in favor of the tenant, and the court finds that No. 4, one Universal axle stand; No. 6, one small grinder attached to the work bench; No. 8, one brake band riveter, type A668, which is listed in exhibit "A," attached to the

petition, as a riveter, but the testimony, answer 697, discloses clearly that it is a "lifter;" No. 14, one burning-in stand, and No. 15, Ford motor propelling it; No. 16, U. S. automatic air compressor; No. 19, one "U" track, being the part installed by Schinkel; No. 31, gas pipe unattached to building; and No. 36, one Echo air machine, as well as No. 20, being the small hoist of approximately a ton or a ton and a half, which was installed in the place of one that has been discarded, were each and all purchased and installed by Elmer Schinkel while he was conducting this garage as a tenant and are trade fixtures.

As to this equipment installed by Schinkel, we believe that the evidence brings it clearly within the rules laid down by Goss, C. J., in *Moran v. Otoe County Nat. Bank* (1927) 115 Neb. 515, 213 N. W. 824. This was a filling station case, and held in the first paragraph of the syllabus: "Where fixtures are erected upon and attached to leased real property, by a tenant or other person rightfully there, for a specific use connected with the occupancy during the leasehold term * * * they may be removed by the tenant, * * * during the term of the tenancy, provided the severance can be accomplished without injury to the landlord's freehold." This case is the leading case in an article on fixtures in 6 Neb. Law Bulletin, 199.

And we hold that, as the purchase price of all items in dispute is held in escrow awaiting this decision, as to all of the above items installed as trade fixtures by the tenant, Elmer Schinkel, the court shall direct that the value. of such items deposited with the escrow agent shall be paid to him.

The cause is remanded to the district court, with instructions to modify the decree appealed from and to enter a new decree in accordance with this opinion as to the 41 items in the exhibit attached to the petition.

AFFIRMED IN PART, AND REVERSED IN PART,
AND REMANDED, WITH DIRECTIONS.

Goss, C. J., and Good, J., concur in the result.

Rose, J.

I think the judgment pronounced is right, but I do not

concur in the opinion adopted by the supreme court. To a great extent it contains discussions and rules of law not essential to a decision. What is said on extraneous subjects is dicta not binding on the court or parties in future litigation. The effect is to obscure the decisive points in the case and to unnecessarily increase the cost of publishing the official reports of decisions.