STATE OF NEBRASKA EX REL. FRED EBKE, RELATOR-APPELLANT, v. BOARD OF EDUCATIONAL LANDS AND FUNDS OF THE STATE OF NEBRASKA ET AL., RESPONDENTS-APPELLEES.

47 N. W. 2d 520

Filed April 26, 1951.    No. 32907.

*Paul W. White,* for appellant.

*Clarence S. Beck,* Attorney General, *Robert A. Nelson,* and *Peterson, Devoe & Ackerman,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

Relator filed his petition for a declaratory judgment in the district court for Lancaster County to obtain a construction and to test the validity of Chapter 235, Laws 1947, and Chapter 212, Laws 1949, both of which relate to the appraisal and leasing of public school lands. The trial court found against the relator and dismissed the action. The relator appeals.

The record shows that the Commissioner of Public Lands and Buildings leased Section 36, Township 13, Range 44, to one W. E. Scott on December 31, 1924, for a period of 25 years. On July 2, 1947, shortly after the effective date of Chapter 235, Laws 1947, the lease was assigned to the intervener, Ramey C. Whitney, for a consideration of $10,000. On July 12, 1949, approximately six months prior to the expiration of the lease by its terms, the relator filed his application for a lease on the property. The application contained an offer to pay $2,500 as a cash bonus for the lease in excess of the annual rental fixed by the then existing lease. Proper tenders were made. Relator also filed objections to the application of Whitney for a renewal of the lease with the Board of Educational Lands and Funds. The board overruled the objections to Whitney's application, denied relator's application, and granted Whitney's application for a renewal of the lease previously held by him by assignment. The evidence shows that both the relator and the intervener Whitney were qualified applicants under the statute dealing with the renewal of school land leases. The offer of a cash bonus of $2,500 by the relator over and above the annual rental fixed by the board is established by the record. The sole reason given by the board for rejecting the application of relator was the requirements of Chapter 235, Laws 1947, as amended by Chapter 212, Laws 1949,

which now appear, insofar as they are applicable to this litigation, as sections 72-233, 72-240, 72-240.01, 72-240.02, 72-240.03, 72-240.04, 72-240.05, and 72-240.06, R. R. S. 1943. It is the contention of the board, and the contention was sustained by the district court, that under the foregoing sections of the statute, particularly sections 72-240 and 72-240.01, R. R. S. 1943, it was required to grant the application of the intervener Whitney, the assignee of the previous lessee. It is the contention of the relator that no such absolute right is given by the cited statutes to one seeking the renewal of a school land lease, and, if it be found that such statutes do confer such a right, that they are unconstitutional and void.

The power to lease the public schools lands of the state rests with the Board of Educational Lands and Funds in the manner provided by the Legislature. The Legislature has provided for the appraisal and reappraisal of public school lands for the purpose of securing a value as a basis for fixing the annual rental. The record discloses the intricate method by which the board classifies public school lands and fixes their value for this purpose. The reasonableness of the method used in fixing the arbitrary value of the various classifications of public lands is not here questioned and we shall not therefore enter into a discussion of that subject.

The public school lands of the state are trust property and the state is required to adminster them as such for the benefit of the common schools of the state. State ex rel. Walker v. Board of Commissioners, 141 Neb. 172, 3 N. W. 2d 196; State ex rel. Johnson v. Central Nebraska Public Power & Irrigation Dist., 143 Neb. 153, 8 N. W. 2d 841. It was intended that the lessee of public school lands should be encouraged to improve the lands in the exercise of good husbandry. He was protected in so doing by a statute which provided in effect that if at the expiration of a lease the highest bid received was that of a person other than the lessee, then the value of the improvements were to be appraised and

paid for by the new lessee. § 72-240, R. S. 1943. The statute as it existed prior to 1947 contemplated a public sale of school land leases at public auction. It was determined by this court in 1946 in State v. Platte Valley Public Power & Irrigation Dist., 147 Neb. 289, 23 N. W. 2d 300, 166 A. L. R. 1196, that a lessee had merely a preference right, as distinguished from an absolute right, to a new lease provided no other person offered a higher bid and a better return to the trust. This holding was undoubtedly a motivating factor in the enactment of the statutes here under consideration and lends credence to the contention that the primary purpose of the subsequently enacted statutes is to avoid the effect of this decision. This, of course, the Legislature has a perfect right to do if constitutional provisions are not infringed.

By constitutional provision the lands set aside for the support of schools by the federal government are held in trust by the state. These lands include generally Sections 16 and 36 of each township, except in cases where sales have been made, and in which event other lands equivalent in area were granted in lieu of the lands sold. These lands, therefore, are subject to the rules of law applicable to the handling of trust estates because of the status assigned to them by the Constitution. State ex rel. Walker v. Board of Commissioners, *supra.*

It is clear from the applicable sections of the statute heretofore cited, and the history of previous legislative enactments on the subject, that the Legislature, prior to 1947, intended the rental of public school lands to be 6 percent of their fair market value. As we have heretofore stated, no question is raised as to the reasonableness of the 6-percent provision. The Legislature had provided for appraisals and reappraisals of this property as a means of determining their fair market value. But the appraised value is not necessarily the fair market value. It is only an arbitrary method of

fixing that value where there is no bid or other evidence from which it can be determined. If this were not so, the provisions for notice and public bidding contained in section 72-233, R. R. S. 1943, would be meaningless. In any event, it is clear that until the enactment of Chapter 235, Laws 1947, such was the intent of the Legislature. Such provisions are consonant with the duties of a trustee in the handling of trust property and, consequently, are consistent with the constitutional provision fixing the status of the state as a trustee in the handling of public school lands.

A trustee acts in a representative capacity and persons dealing with him are bound to be cognizant of his powers. A trustee is required to dispose of trust property upon the most advantageous terms which it is possible for him to secure for the benefit of the cestui que trust whom he represents. The rule is no different in the leasing of property of a trust estate. A trustee is required to accept the highest bid in the absence of cogent reasons for not so doing. It is a breach of trust for a trustee to knowingly handle the property of a trust estate for the benefit of any person at the expense of the trust estate. Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393; Clark v. Provident Trust Co., 329 Pa. 421, 198 A. 36; Kane v. Girard Trust Co., 351 Pa. 191, 40 A. 2d 466. It is a fundamental principle that a trustee owes beneficiaries of a trust his undivided loyalty and good faith, and all his acts as such trustee must be in the interest of the cestui que trust and no one else. Wendt v. Fischer, 243 N. Y. 439, 154 N. E. 303; Goldman v. Kaplan, 170 F. 2d 503. The state in acting as a trustee is subject to the same standards, and when its status as a trustee is fixed by the Constitution a violation of its duty as a trustee is a violation of the Constitution itself.

The evidence shows that there are approximately 5,200 tracts of public school lands in this state. While they are subject to reappraisement at any time during

the period of the lease and to a recalculation of the rentals where the existing appraised value is changed, it is shown that a considerable lag exists between market value fluctuations and the appraisal or reappraisal of such lands. Upon the termination of a lease, however, the interests of the beneficiaries of the trust can be protected to some extent, at least, by placing the lease up at public auction as provided by section 72-233, R. R. S. 1943, or by some other method to be provided by statute consonant with the rules of law applicable to trustees acting in a fiduciary capacity.

It is the contention of the board and the intervener that there are other considerations that enter into the situation and that the attainment of a maximum return to the trust is not a controlling factor. In this respect we point out that the primary purpose of the trust is the production of income for the support and maintenance of the common schools of the state. Art. VII, § 4, Constitution of Nebraska. While it is true that reasonable precautions should be taken for the protection of the property within the trust, such a rule does not mean that the question of income becomes an unimportant factor. In the present case, for instance, the board found the relator and intervener were qualified applicants for a lease of school lands. Consequently, the loss sustained by the fund by the failure to accept the cash bonus, or to sell the lease at public auction, cannot be charged to a want of qualification by the relator. In addition thereto the leases are subject to cancellation for failure to comply with requirements. The argument is advanced that a private owner would not seek out a tenant by a public auction of a lease. The situations are not at all comparable, but in any event it seems logical to say that, everything else being equal, a private owner would accept the higher rental offer. We take the view that the losses shown by the record to have been sustained by the trust estate are of such magnitude that they cannot be justified on the basis

that they were necessary to secure a proper handling of the property by lessees. There must be a reasonable relation of the amount of such losses to the evils sought to be corrected, which makes the losses in fact necessary. There is no evidence in the record that any such reason motivated the enactment of the legislation, or that it was necessary to adopt such a plan in order to secure qualified bidders. This attempted justification of the losses sustained appears to be highly speculative and without foundation in fact. The rentals are to be paid in cash and are in no manner dependent upon the crops raised or the uses made of the property. It seems to us that waste and improper husbandry affecting the value of the lands leased can be and are adequately controlled by the statutes on the subject and the regulations of the board.

By the statute here questioned, the Legislature provided that a lessee of public school lands could obtain a renewal of the lease under the following conditions: If the lessee applies for a new lease the board shall cause a reappraisal of the land to be made and shall determine if the applicant during the period of the existing lease has (1) followed the standards of soil conservation and good husbandry, (2) properly utilized the land for the purposes contemplated in the lease, (3) faithfully performed all covenants in the existing lease including payment of the required rental, and (4) has cooperated with the board in the proper care of the premises. If these requirements are met, the board is required to grant a new lease. § 72-240.01, R. R. S. 1943. If no application is made by the lessee, or if he has failed to meet the requirements specified, the board within three months may enter into a lease with any person willing and able to meet such requirements. § 72-240.02, R. R. S. 1943. It will be noted that these sections abandon competitive bidding and require the board to lease the lands to existing lessees at a rental based on the appraised valuation, without regard to the fair

market value of the property. In other words, the arbitrary valuation established by the board is adopted as the fair market value of the property irrespective of any other evidence on the subject. These statutes have removed from the consideration of the board the fair market value of these lands as the same may be made to appear by evidence. The record shows that the board has been required by the provisions of the statute to decline innumerable bids greatly in excess of those accepted from existing lessees. A trustee has no such right to favor one class of bidders at the expense of the trust estate.

An examination of the evidence in this record reveals the results that accrue from the failure of a trustee to comply with the strict requirements imposed upon one acting in a fiduciary capacity.

The statute provides in part that if an assignment of a school land lease is made, one-half of the consideration of the assignment, exclusive of improvements purchased, shall be paid to the board. The record shows that between July 1, 1949, and June 1, 1950, 146 such assignments were made for a total consideration of $153,734.24, of which the board received $76,867.12. It is apparent that the item of $153,734.24 represents a value in the leases assigned over and above the rentals required by the terms of the leases. While it is true that a portion of this amount may be due to increased valuations of the lands after leases were made, and before reappraisal, and is therefore inconclusive, it certainly does not wholly arise from this source when other evidence in the record is considered.

The record shows that there were 49 assignments of school land leases from December 22, 1947, to May 23, 1949, for which a consideration of $171,937.00 was paid in excess of the rentals provided in the leases and the improvements purchased by the assignees. It is noteworthy that the total appraised value of the lands involved in these assignments was $189,655.00. The rent-

als on the lands based on this valuation amount to $11,379.30 a year. For the 12-year period of the lease they would amount to $136,551.60. In other words, the considerations paid for the assignments amount to $171,-937.00, while the rentals obtained amount to only $136,-551.60. In other words, the lands in question were leased at approximately 45 percent of their fair market rental value. It is quite evident that the item of $171,-937.00 is something more than the result of increased valuations occurring during the lag between rising valuations and reappraisals by the board.

The record also shows that from July 1, 1949, to June 1, 1950, the board issued new leases for 61 tracts of public school lands. These 61 tracts produced bonus bids of $98,941.00 in excess of the rentals provided for in the leases themselves. This is of course conclusive proof that 6 percent of the appraised value was not a fair and reasonable return from the lands on the basis of their fair market value.

It is shown that the intervener in the present case paid $10,000 for the lease here involved when it was within two years of expiring by its terms. If this lease was worth $10,000 for two years, in excess of the rentals contracted to be paid, it is self-evident that the appraised value was far less than its fair market value. If the value of the remaining two years of the lease was enhanced by the enactment of the legislation here questioned, it supports the theory of the relator that such legislation was for the benefit of lessees of public school lands at the expense of the beneficiaries of the trust. The fact that the assignment was made almost immediately following the effective date of Chapter 235, Laws 1947, is very persuasive in the reaching of a similar conclusion.

The record shows that 1,235 leases were assigned by lessors or renewed by the board during the year 1949, approximately 1,160 of the number being renewals to former lessees. It is estimated by the board's chief land

appraiser that if these leases had been put up at public auction they would have produced approximately from $1,250,000 to $1,500,000 in excess of the rentals provided for in the leases.

We necessarily come to the conclusion that the applicable sections of the 1947 and 1949 acts provide an arbitrary method of determining the fair market value of the public school lands of the state for the purpose of calculating the rentals to be collected therefrom. The results of the operation of these provisions conclusively establish that the method provided does not reasonably determine the fair market value of these lands, due undoubtedly to the inherent difficulties in determining the fair market values of the 5,200 tracts involved and the inevitable lag that is bound to exist between rising valuations and reappraisals by the board. The effect of the acts here questioned is to confer special benefits upon the holders of leases of school lands to the detriment of the beneficiaries of the trust. A trustee in so handling trust property violates his duty as a trustee. His handling of trust property, including the rental thereof, must be in such a manner as to produce a reasonable rental based upon the fair market value of the property. This duty was imposed upon the state by the Constitution when it designated the state as a trustee. The plan set up by the Legislature is inconsistent with the duties imposed by law upon a trustee and, consequently, inconsistent with the grant and the acceptance thereof.

That the Legislature has the power to provide the method of administering the public school lands of the state as a trust is not subject to question. But the method provided must be one which is within the law governing the administration of trust estates. The designation of these lands as a trust in the Constitution has the effect of incorporating into the constitutional provision the rules of law regulating the administration of trusts and the conduct and duties of trustees. A breach

of trust in such a situation is in effect a violation of the constitutional provision and has the effect of invalidating the legislation authorizing the breach. The evidence in the record establishes that the legislation in question operates to the special benefit of existing lessees desiring to continue as such at rentals based on arbitrary valuations shown to be much less than the fair market value of the property. This is not within the power of the Legislature. Its duty in providing a method of administering a trust, of which the state is a trustee, is to act for the best interests of the trust estate and obtain for it the most advantageous returns possible. In setting up an administrative plan which abandons public bidding in favor of new leases to existing bidders based on arbitrary valuations shown to be substantially less than fair market values, the Legislature has violated the duty of the state as trustee and, as we have heretofore stated, it has violated Article VII, section 9, Constitution of Nebraska.

The respondents cite cases from other jurisdictions holding that under certain conditions a preference right to existing lessees will be given effect. We find no fault with the principles announced in these decisions. We do not doubt that valid reasons may exist under the statutes under consideration which would entitle the existing lessee to a preference. But none of the cases cited are based upon any such statement of facts as are contained in the record before us, nor do they state any principles of law that conflict with the law announced in this opinion. Even if, as contended by respondent, the duty of a trustee is to deal with trust property with such skill and care as a man of ordinary prudence would exercise in dealing with his own property, and that he should use reasonable care only to preserve the trust property and make it productive, a complete answer is that there has not been such a compliance with the rule for which they themselves contend. It would be difficult to visualize a prudent person in the handling of

his own affairs to follow a plan which produces losses of the magnitude shown by this record. To say that a person handling property in a fiduciary capacity under a plan which shows on its face an intent to base the return from it on arbitrary value rather than on its fair market value evidences an intent to circumvent the recognized duties and functions of a trustee.

We hold therefore that the portions of Chapter 235, Laws 1947, and Chapter 212, Laws 1949, now designated as sections 72-240 and 72-240.01, R. R. S. 1943, are violative of Article VII, section 9, Constitution of Nebraska. We further hold that the lease of Section 36, Township 13, Range 44, Deuel County, Nebraska, bearing date of November 14, 1949, to the intervener, Ramey C. Whitney, for a period of 12 years commencing January 1, 1950, was issued without the authority of law, and that relator, under the circumstances shown, was entitled to the lease of said section for the amount bid by him. The judgment of the district court is reversed for the reasons herein stated.

REVERSED.