JESSIE O'NEIL, ADMINISTRATRIX OF THE ESTATE OF ROBERT
O'NEIL, DECEASED, APPELLEE, V. LAVON HAARBERG ET AL.,
APPELLANTS.

139 N. W. 2d 217

Filed January 4, 1966.     No. 36012.

Daniel E. Owens, for appellants.

Curtis & Curtis, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH,
BROWER, SMITH, and McCOWN, JJ.

BROWER, J.

Robert O'Neil in his lifetime was the lessee in a lease
of a section of school lands in Hayes County, Nebraska,
given by the Board of Educational Lands and Funds.
The lease expired December 31, 1963.  Robert O'Neil
died February 27, 1963, and the appellee Jessie O'Neil
was appointed and is acting as administratrix of his es-
tate.  The lease of this land was offered for sale by the
Board of Educational Lands and Funds on October 24,

1963, at which sale Lavon Haarberg and Sharon Haarberg, the appellants, were the highest bonus bidders and were awarded and received a new 12-year lease which went into effect on January 1, 1964.

The lessees in their respective leases failed to agree on the amount to be paid for the crops growing on the section and three appraisers were appointed pursuant to section 72-240.06, R. S. Supp., 1963. From the award of the appraisers the Haarbergs appealed to the district court for Hayes County. On the appeal Jessie O'Neil, administratrix, was designated as plaintiff and Haarbergs as defendants. They will be referred to herein as they were designated in the trial court, and when defendant is mentioned in the singular, it will refer to Lavon Haarberg.

A trial to a jury in district court resulted in a verdict and judgment in favor of the plaintiff in the sum of $6,742. From an order overruling their motion for a new trial the defendants have appealed.

The defendants assign as error to the trial court that the verdict and judgment are contrary to the law and the evidence. They also contend certain instructions given were erroneous and that the trial court erroneously failed to instruct the jury upon the theory of the defendants.

It was stipulated there was planted by the plaintiff and growing on the premises on January 1, 1964, 354 acres of wheat and 74 acres of rye. This stipulation further showed the acres allotted to the premises by the governmental authorities as a wheat base was 157.2 acres and that the defendants bid and paid a bonus of $8,500 for the new lease under which $1,890.30 was the applicable annual rental. The undisputed evidence shows that the defendants took in cattle of others for pasturage on the growing small grain crop and received $998.63 therefor. The premises were unfenced and had thereon no well or source of water. Within time to effect compliance with the government's crop regula-

tions defendant destroyed 200 acres of the wheat and all of the rye for which he received wheat certificate payments and the payments from the government agency in the amount of $1,961. On June 21, 1964, the remaining crop was totally destroyed by hail.

The evidence with respect to the value of the wheat and rye on January 1, 1964, is in conflict. Testimony of the plaintiff was that she hired her husband's cousin to summer fallow the land. She paid $357 for each of three operations in preparing the land. About half of the ground so planted was rodweeded before drilling at $1 an acre. Drilling cost another $1 for each acre. The seed wheat cost $814, and the rye $111. The average production of wheat in Hayes County was 27 bushels per acre, and of rye 10 bushels. The market on wheat at harvesttime was $1.27 a bushel and on rye $0.92. Harvesting costs would have been $4 an acre. It was a normal season, the soil where planted was good, and she felt on January 1 a normal crop was to be expected. The plaintiff testified the wheat was worth $34.92 per acre and the rye $9 per acre on January 1, 1964. She knew the expiration date of her lease.

Several other farmers were called as witnesses by the plaintiff, some of whom had appraised the growing crops. They valued the wheat between $25 and $22.13 per acre. They considered the rye to be of little or no value except for pasturage and to keep the soil from blowing. The rye was planted on the more sandy portions of the land. These witnesses said portions of both the wheat and rye acreages contained wild oats, which is sometimes referred to as downy brome. The acres affected, the extent of the infestation, and the resulting damage varied considerably with the testimony of the several witnesses but they did not consider it widespread or serious. Some said they made allowance for this in their estimate of value. Most of them stated the wheat had a good stand and made a good cover, and that the rye was not so good. There was testimony that there were 3 or 4

inches of rain in the latter part of October and other normal rainfall in the fall of 1963, and that the condition of the crops as to moisture was good.

The defendant testified that the crops on the whole place had wild oats in them and if left would choke out the crops and damage the land for cultivation in future years as they ripen their seeds in May. He had pastured 150 head of cattle for 10 days beginning April 15, 1964, after which until May 20, 1964, there were either 200 or 250 head. He received 13 cents a day per head. Defendant was forced to install 4 miles of temporary fencing in order to pasture the cattle and hauled water for them twice daily and three times when it was warm. The wheat was not worth more than $10 an acre on January 1, 1964, and the rye of no value.

Several farmers were called as witnesses by the defendants. They all testified at considerable length concerning the infestation of the crops by wild oats. Their testimony varied in that respect also but they generally agreed more damage would naturally follow to the crops because thereof than the plaintiff's witnesses. One said the crops were practically worthless except for grazing, for which purpose he valued them at $1,750. Another stated the growing wheat was worth not to exceed $10 or $11 an acre and declined to value the rye. Similar testimony was given by other witnesses. One estimated the wheat was worth $10 or $12 an acre. Two gave no opinion as to the value of the crops on January 1, 1964, one of whom stated he would decline to buy such crops at that time as it would only be a gamble.

The provisions with respect to the obligation of a lessee of state school lands with respect to the purchase of the improvements thereon at the expiration of the prior leasehold estate were hitherto set forth in section 72-240.06, R. R. S. 1943. This section was amended by Laws 1963, chapter 417, section 1, page 1340. The new statute was effective October 19, 1963, only 5 days before the sale at which defendants bid in the leasehold inter-

est at public sale. As far as it affects the present action there was no significant change made by the amendment. We will quote certain portions pertinent to this action from section 72-240.06, R. S. Supp., 1963, as follows: "All authorized improvements on school land leases shall become the property of new lessees in all instances, and payment shall be made to the old lessees as herein provided. * * * Improvements to be included in such appraisement shall be all buildings, fencing, wells, windmills, pumps, tanks, irrigation improvements, assessments paid to any irrigation district, dams, drainage ditches, conservation terraces, trees, ,plowing for future crops, and alfalfa or *other crops growing thereon.* * * * The new lessee shall pay all costs of the appraisement.

"(2) Either the former lessee or the new lessee may, if he is dissatisfied with the appraisement, within thirty days after the filing thereof, appeal therefrom to the district court of the county in which the land is situated, by filing a notice of appeal with the county judge. Thereafter all proceedings on appeal shall be had and conducted in the manner prescribed in sections 76-716 to 76-720." (Italics supplied.)

This court in the case of Kidder v. Wright, 177 Neb. 222, 128 N. W. 2d 683, construed this section as it was before the amendment mentioned. In its syllabus this court held: "Section 72-240.06, R. R. S. 1943, provides the procedure for the appraisement of improvements on school land when a lease has been terminated by expiration or forfeiture. The procedure prescribed therein is an exclusive remedy that is binding upon all lessees of school lands." In the body of the opinion, the court held: "The statute enters into and becomes a part of the contract between the state and each lessee."

The defendants have two theories respecting their contention that the verdict and judgment are contrary to the law and the evidence. They first urge a lessee who plants crops, knowing the term of his lease will expire before they ripen and can be harvested, loses all his interest

therein when the new lessee takes possession of the premises under his term. They cite several cases involving the usual lease between private parties, including Peterson v. Vak, 160 Neb. 450, 70 N. W. 2d 436, 51 A. L. R. 2d 1221. It is so obvious that those cases involve an entirely different situation other than the one before us which is governed wholly by the cited statute that discussion of them is unnecessary. Defendants' contention cannot be sustained.

The defendants next cite Platte Valley Public Power & Irr. Dist. v. Armstrong, 159 Neb. 609, 68 N. W. 2d 200, an eminent domain proceeding, calling particular attention to a portion of that opinion which states: "In the light of the foregoing, it is logical to conclude, as we do, that an owner or tenant in possession of a farm who at the proper time, in due course of good husbandry and in good faith, plants a crop on the land after the petition for condemnation is filed but before condemner has deposited the award with the county judge or before condemner has by some binding election accepted the award, and such crop is growing but unmatured at the time of such deposit or election, may as of that time ordinarily recover damages for injury to or destruction of his share of the value of such crop in its then condition. 18 Am. Jur., Eminent Domain, § 256, p. 896. However, condemnee must establish the foregoing conditions by a preponderance of competent evidence which also meets the requirements as to measure of damages and sufficiency and clarity of proof to take it out of the realm of speculation for the purpose of submission to a jury within the meaning of relevant rules announced in Gledhill v. State, 123 Neb. 726, 243 N. W. 909; * * *."

Defendants argue that because that portion of section 72-240.06, R. S. Supp., 1963, states that "all proceedings on appeal shall be had and conducted in the manner prescribed in sections 76-716 to 76-720," which governs appeals in eminent domain proceedings, that the rules in such proceedings apply with respect to the proof re-

quired in the case before us. They claim the burden of proof is on plaintiff to show that the crops planted by her were planted in good faith and in due course of good husbandry. We think the reference to the sections on appeals from an award in condemnation means only that the proceedings on appeal shall be conducted in the manner prescribed in sections 76-716 to 76-720, R. R. S. 1943, and does not affect the rules of proof and of recovery. Such recovery and the payment of the award itself is governed in the present circumstance by section 72-240.06, R. S. Supp., 1963. The two proceedings are entirely different. In condemnation proceedings the recovery is for damages, and in the case before us it is based on the contract of the parties in which the statute becomes a part of those contractual rights and obligations. In the present case the crops were planted in season before the auction of the new leasehold interest. The plaintiff did not know whether she or another would acquire the new lease. Her testimony indicates the crops were planted in good faith. The state apparently in the interest of good husbandry has provided that farming operations continue uninterrupted by the change of leasehold interests. The assignment of error has no merit.

The defendants' complaint of the trial court's failure to submit their theory of the case relates to its failure to submit to the jury the issue of the plaintiff's good faith in planting the crops as well as their theory that if plaintiff planted them knowing the lease would end before harvest there could be no recovery. These aspects of the case have already been answered contrary to defendants' contention.

The defendants assign error to the trial court's giving certain specific instructions, No. 3 and No. 4. They relate to the evidence to be considered by the jury in assessing the value of the unmatured and growing crops on January 1, 1964. The instructions are long and this opinion would be unnecessarily lengthened to quote

them. When taken together the instructions seem in substance to follow quite closely the instruction set out in Hopper v. Elkhorn Valley Drainage Dist., 108 Neb. 550, 188 N. W. 239, which was as follows: " 'In determining the value of the crop of any year at the time of its injury or destruction, you should take into consideration the kind of crops planted, the nature of the land, the kind of season, whether wet, dry, or normal, what crops such land according to the season would ordinarily yield, the state of the crops' growth when injured or destroyed, the average yield of similar land in the neighborhood, the crop of which was cultivated in the same way and not injured, the market value of the crop injured and the market value of the reasonably probable crop without injury at the time of maturity, the expense that would have been incurred after the injury of fitting for market the portion of the crop the wrongful act prevented from maturing, the time of the injury, the circumstances which conditioned the probability or improbability of the maturing of the crops in the absence of injury, and all other facts and circumstances shown by the evidence tending to establish such value.' " We think the general rule there stated with respect to injury or destruction is applicable to the present case where it is sought to determine the value of such crops on the date of the commencement of the new lease.

The defendants contend the trial court by these instructions permitted the jury to speculate upon the possible production of wheat and rye but withdrew from its consideration the right to consider that 200 acres of such wheat constituted acres in excess of the allotted acres and the value of such acres would be considerably less than the value of the remainder of the crop. We think the trial court properly instructed the jury on this aspect of the case in the second paragraph of instruction No. 4, as follows: "The defendant contends that it was necessary for him to destroy 200 acres in order for him to

comply with the government regulations under the support program and to obtain government payments. You are instructed that said contention is no defense in this case and you have no right to consider such contention in arriving at your verdict, *except in so far as the same might have affected the right of the owner to sell the wheat upon maturity and the reasonably probable market price.*" (Italics supplied.) We think the instruction proper under the evidence in the case. If the defendants desired a more specific instruction they should have tendered one which they did not do. We have examined all of the instructions complained of by the defendants and find no error in them.

We conclude that under the conflicting evidence hitherto summarized the jury by giving credence to the testimony of the witnesses for plaintiff might properly have found the value of the crops in question to be in the amount of their verdict.

We find no error in the submission of the cause to the jury. Its verdict and the judgment of the court entered thereon were sustained by the evidence and the law and are affirmed.

AFFIRMED.