HERMAN F. BANKS ET AL., APPELLEES AND CROSS-APPELLANTS, V. STATE OF NEBRASKA ET AL., APPELLANTS AND CROSS-APPELLEES.

147 N. W. 2d 132

Filed December 20, 1966. No. 36344.

Clarence A. H. Meyer, Attorney General, and Bernard L. Packett, for appellants.

Maupin, Dent, Kay & Satterfield, McGinley, Lane,

Mueller & Shanahan, Charles Thone, and Charles Huff, for appellees.

Heard before CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and COLWELL, District Judge.

SMITH, J.

The Board of Educational Lands and Funds took steps to sell school land occupied by plaintiffs under an expiring lease. This controversy followed in the form of a disputed title to permanent improvements on the land. The district court rendered a responsive declaratory judgment. It quieted the title in plaintiffs to a stock well, other structures, and a growing crop. It quieted also the title in the board to loading chutes, corrals, a board windbreak, and land leveling.

The parties relate their assignments of error on appeal and cross-appeal to these topics: Statutory authority for improvements; necessity for administrative approval of proposed improvements; and existence of requisite approval. We study also the nature of an outgoing-tenant's property interest.

The dispute sprang from a major change in legislative policy. For a long time leases had been common and sales rare. The 1965 Legislature directed the board to sell the school lands at the expiration of current leases. In doing so, it made no reference to improvements or to an outgoing-tenant's interest. §§ 72-257 and 72-258, R. S. Supp., 1965. Legislative policy is interwoven with the evidence, which is undisputed.

The board leased 320 acres in Chase County, Nebraska, to plaintiffs on October 16, 1953, for a 12-year term ending December 31, 1965. In connection with the lease plaintiffs paid the outgoing tenant for a house, barn, granary, and the stock well and tower, all of which had been built in 1943. The lease provided that plaintiffs would commit no waste and that the state would have a lien on all improvements as security for performance.

Plaintiffs themselves made improvements. In the be-

ginning they built fences, a loading chute, and a corral. In 1964 they erected the board windbreak. During 1963-1965 they leveled 150 acres of land for irrigation. Subsequent to August 16, 1965, the date of the passage of the sales law, they planted 25 acres in wheat, which was unmatured at the expiration of the lease.

The factual issue of approval by the board is limited to the land leveling; lack of approval for other improvements in question is admitted. Plaintiffs proposed to drill an irrigation well and to irrigate 100 acres in 1963. The estimate of cost was $3,300 for the well and $35 per acre for land leveling. A soil conservationist recommended the leveling.

The board met March 11, 1963. The agenda contained this description of plaintiffs' proposal: "Lessee requests permission to drill an irrigation well on this lease at an approximate cost of 3300, the plan has been approved by the Soil Conservation Service."

The record does not show any action on the proposal for leveling, but a permissible inference of approval is argued. The secretary of the board discussed the proposal in correspondence prior to the meeting but not afterward. A subsequent notification simply stated that the board had approved the request to drill an irrigation well at an approximate cost of $3,300.

In December 1965, the board published notice of public sale on January 6, 1966. To be sold was the land with "All improvements * * * placed (on it) * * * without the approval of the Board * * *, including * * * house, outbuildings, stock well, fencing, also including all growing crops * * * at the time of sale." Plaintiffs commenced the present action on December 29, 1965. We assume that the board is withholding the land from sale pending final judgment. There is no direct evidence of possession in 1966.

Statutes operating on the date of plaintiffs' lease provided a right and a remedy. If the outgoing lessee and the incoming lessee were unable to agree on the value

of improvements, an appraisal was made. It included all buildings, fencing, wells, windmills, irrigation improvements, dams, drainage ditches, trees, plowing for future crops, and growing crops. The incoming lessee was required to pay the appraised value for the benefit of his predecessor. Laws 1953, c. 255, § 1, p. 862; former § 72-240.06, R. R. S. 1943.

Other statutes provided as follows:

"Before any buildings, wells, irrigation improvements, dams, or drainage ditches are placed upon school lands by a lessee, written approval must be obtained from the Board * * * except necessary improvements for the temporary handling and sheltering of livestock. Any such improvements placed upon school lands after September 14, 1953, where written approval * * *was not obtained * * * shall be considered improvements of the land and the lessee shall not be entitled to reimbursement therefor." § 72-240.07, R. R. S. 1943.

"All improvements put on leased public land shall be assessed to the owner of such improvements as personal property, * * *." Laws 1911, c. 104, § 4, p. 372; former § 77-1209, R. R. S. 1943.

In 1957 the Legislature added: "All authorized improvements * * * shall become the property of new lessees in all instances, and payment shall be made to the old lessees * * *." Laws 1957, c. 303, § 1, p. 1107; § 72-240.06 (1), R. S. Supp., 1965.

The board contends that the 1943 structures were unauthorized. It relies on the unconstitutionality of the appraisal statute that preceded the 1953 act. In Watkins v. Dodson, 159 Neb. 745, 68 N. W. 2d 508, an outgoing tenant was deprived of procedural due process; the statute failed to require notification of hearing before the appraisers. Without much explanation we later decided that an outgoing tenant had an interest in structural improvements, notwithstanding the unconstitutionality of the whole statute. Mara v. Norman, 162 Neb. 845, 77 N. W. 2d 569.

The 1953 act and the amendment determine the legal operation of plaintiffs' lease. The former tenant had a property interest and plaintiffs paid him for it. Despite the obscure rationale Mara v. Norman, *supra*, answers the argument of the board.

In order to decide whether board approval of other structures was necessary, we construe the 1953 act. The parties agree that the loading chute and board windbreak are fencing under the statute. We add the corral. It has more the characteristics of fencing in the statutory frame of reference. " 'A fence is an inclosing structure, * * * intended to prevent intrusion from without or straying from within.' " Shamberg v. City of Lincoln, 174 Neb. 146, 116 N. W. 2d 18. See, also, Webster's Third New International Dictionary (unabr.) "corral," p. 511. Because fencing was specified for appraisal but not for approval, plaintiffs were not required to obtain approval.

If our opinion rested entirely on plaintiffs' interest under the leasing statutes, it would be incomplete. The board expects a new owner, not a new tenant. The immediate question is the meaning of the sales sections, which are conjoined with the leasing sections. The answer lies partially in the course of legislation on the general subject.

Under an 1867 act an occupant had an option between receiving the appraised value of his improvements from the purchaser of the school land or removing the improvements within 6 months after sale. G. S., c. 70, § 14, p. 994, § 19, p. 995. The 1897 Legislature made substantial changes. It generally prohibited sales, and it restricted the option between compensation or removal under the leasing policy to moveable improvements. Laws 1897, c. 71, § 1, p. 318, § 5, p. 319. A 1919 statute provided in part: "If the highest bid * * * shall be made by a person other than the lessee the value of all the improvements on the land shall be appraised * * *. The successful bidder * * * shall * * * pay to the county

treasurer, for the use of the former lessee, the amount of the appraisement." Laws 1919, c. 149, § 1, p. 333.

Statutes of 1919 and subsequent years have not restricted compensation to moveable improvements. Moreover, the Legislature has not permitted a tenant to opt for removal. The statutes on their face declare a compensation policy that has been uninterrupted for almost 50 years. It is too late now for us to say that an outgoing tenant necessarily has no interest whatever.

The property interest resulting from structural improvements comprises either a common law privilege of removal or a right to compensation. Such a privilege ought to fit apparent policy; yet the remedy of compensation in the leasing system is exclusive. Kidder v. Wright, 177 Neb. 222, 128 N. W. 2d 683; O'Neil v. Haarberg, 179 Neb. 531, 139 N. W. 2d 217. The privilege would be an inadequate substitute for compensation. In association with irremoveable improvements such as land leveling and well holes, it would be no substitute at all. Tenants would depart empty-handed because of the difference between lease and sale. We conclude that the privilege is not adaptable.

The common law is also hostile to an interest of a former tenant in unmatured crops. Plaintiffs planted wheat during a tenancy for a definite term and after the date of the passage of the sales law. The crop was growing at the expiration of the lease. In such circumstances at common law a tenant is not entitled to crops. See, Peterson v. Vak, 160 Neb. 450, 70 N. W. 2d 436, 51 A. L. R. 2d 1221; Vance v. Henderson, 141 Neb. 766, 4 N. W. 2d 833; Peterson v. Vak, 169 Neb. 441, 100 N. W. 2d 44.

The Legislature has encouraged good husbandry and continuity in farming operations. O'Neil v. Haarberg, *supra;* State ex rel. Ebke v. Board of Educational Lands & Funds, 154 Neb. 244, 47 N. W. 2d 520; State v. Platte Valley P. P. & I. Dist., 147 Neb. 289, 23 N. W. 2d 300, 166 A. L. R. 1196. The practice in the western part of

Nebraska is to seed a grain crop in the fall and to harvest it in the summer. A calendar year unit serves no functional purpose in a lease, unless a former tenant retains an interest in the growing crop. If we upheld the board, utilization of crop land during the final year of the lease would be adversely affected. "If such land should not be sold * * *, then it shall be offered for lease as the Board * * * shall provide for a period of six years." § 72-258.01, R. S. Supp., 1965. Few tenants would take that chance.

In our opinion improvements compensable under the leasing statutes are also compensable under the sales statutes. The value of a tenant's property interest is required to be determined prior to sale of the land. Beneficial interests in the educational trust must of course be protected fully. We reiterate:

"The public school lands of the state are trust property and the state is required to administer them as such for the benefit of the common schools * * *.

"* * * These lands * * * are subject to the rules of law applicable to the handling of trust estates because of the status assigned to them by the Constitution." State ex rel. Ebke v. Board of Educational Lands & Funds, *supra*.

Plaintiffs had a property interest resulting from all improvements in question, except the development by land leveling. The judgment is reversed and the cause remanded with directions to render judgment declaring that plaintiffs have a compensable interest resulting from the improvements, except the land leveling, and that the value of their interest is required to be determined prior to the sale. Costs on appeal are taxed to the board.

REVERSED AND REMANDED WITH DIRECTIONS.

BROWER, J., dissenting.

I respectfully dissent from the decision of the court in this case. The result of that decision is that under section 72-240.07, R. R. S. 1943, all enumerated improvements placed upon the school lands by a lessee prior to

September 14, 1953, were the property of the lessee and such improvements placed thereon thereafter were his property also if he had secured written consent of the Board of Educational Lands and Funds. It then gave the lessees everything they claimed except the land leveling. Their claim to the latter was rejected solely because it was placed thereon subsequent to 1953 without receiving written consent. It then proceeded to go further than the trial court went or either of the parties asked in their briefs and held the land could not be sold unless the value of the improvements given by the opinion to the tenant was first determined.

The opinion clearly recognizes that the tenants' rights in the improvements consist of "either a common law privilege of removal or a right to compensation." It then proceeds to state the privilege of removal would be inadequate and that for land leveling and well holes it would be completely unavailing. The tenant would in such instances "depart empty-handed." To my way of thinking, under the present opinion the schools of the state, which are the real owners of the lands in question, will depart with their lands impaired to the extent of many millions of dollars. From the last report of the Board of Educational Lands and Funds, which is in evidence in the present case, the lands involved in 1964 exceeded 1,600,000 acres.

We start with the well-established principle that the state is a trustee of the school lands and that as trustee it has no right to either give away or encroach upon their value. State ex rel. Ebke v. Board of Educational Lands & Funds, 154 Neb. 244, 47 N. W. 2d 520. Certainly a strained construction should not be placed upon statutes wholly by implication which results in impairing their value in the hands of the trustee.

Under the common law, in the absence of an agreement to the contrary, the tenant may remove improvements made in furtherance of the purpose of the lease provided he leaves the premises in as good condition

as when he received them, but he may not remove improvements which have become an integral part of the property and which cannot be removed without material injury to the premises. 51 C. J. S., Landlord and Tenant, § 394c, p. 1137. This state followed the common law and has held that the tenant had the right to remove improvements at any time before the expiration of the term, Phelps v. Blome, 150 Neb. 547, 35 N. W. 2d 93, or the yielding up of possession, Frost v. Schinkel, 121 Neb. 784, 238 N. W. 659, 77 A. L. R. 1381. There is a presumption that the Legislature, in enacting a statute, did not intend to make any alteration in the common law other than that specifically stated; and it will not be presumed that the common law was repealed by the statutory or a constitutional provision, unless the language naturally and necessarily leads to that conclusion. 15 C. J. S., Common Law, § 20b, p. 633.

The opinion of the court cites a statute of 1867 which provided that an occupant of school lands had an option between receiving the appraised value of his improvements from the purchaser or removing the improvements within 6 months after sale. This statute was repealed by a subsequent section of that statute mentioned in the opinion as having changed it. Laws 1897, c. 71, § 4, p. 331. A labyrinth of statutes dealing with the school lands have been enacted in the past. Some of them purported to change the common law of landlord and tenant in some particular while they existed. Only those in force during the term of the leases before us need concern us. Here it is not necessary to search the record of the past for statutes long since repealed to guide us in the present. We have the common law. "When a statute abrogating a rule or principle of the common law is repealed, the common-law principle or rule is ipso facto revived, unless there is something to show a contrary intent on the part of the legislature." State ex rel. Wright v. Barney, 133 Neb. 676, 276 N. W.

676.  See, also, 15 C. J. S., Common Law, § 12b, p. 621;
50 Am. Jur., Statutes, § 525, p. 532.  I conclude that the
common law with respect to the rights of landlord and
tenant is in force with respect to the school lands save
only as it is changed by presently existing statutes.

In spite of the presumption that the Legislature did
not intend to make an alteration in the common law
other than specifically stated, the opinion discards en-
tirely the law of landlord and tenant as it applies to the
school lands.  It does so by citing special statutes which
set out specific rights between successive lessees and are
clearly applicable to them only.  It curtails the right of
the owner to dispose of those lands until there has been
a determination of the value of the improvements.  No
present statute is pointed out that purports to change
the common law rights or obligations with respect to
those lands between landlord and tenant.  The statute
directing the sale contains nothing to indicate such a
change.  It does not direct the determination of the
value of the tenants' improvements, nor provide for their
being compensable on sale.  It appears to the writer the
legislative intent was to restrict the rights of the lessee
to those provided at common law when leasing has
ended and a sale is to be made.  Who is to pay for the
improvements when valued?  Surely not the state
itself for it should not mingle its funds with those for
whom it is trustee.  Neither is there statutory author-
ity to invest the school funds therein.  Nor should there
be since those funds should remain inviolate.  It must be
the purchaser although the opinion does not say so.

It is obvious that if the land is sold without a de-
termination of the rights of the lessees to the improve-
ments, no purchaser would be inclined to buy a law-
suit.  Bidding by those other than occupying lessees
would be effectively chilled.  In an attempt to avoid
this patent danger the decision of the court has post-
poned a sale until the value of the improvements has
been determined.  It does not purport to point out how

this is to be ascertained. Either it is left to the trial court or to future legislation. It plainly states, however, the value is to be determined before sale. This would appear clearly to be to the lessee's advantage. The present provisions of law requiring an appraisement between the outgoing and incoming tenant is properly designed to secure a fair valuation. Presumably both are residents of the vicinity where the lands lie, are familiar with the premises, and are cognizant of its worth as well as the character and value of the improvements. The outgoing tenant desires to get as much for his improvements as he can and the incoming tenant to pay no more than required. Their interests and rights are adverse, as they should be. If appealed, the ensuing action is adversary in nature. Who is to see the improvements are not overvalued under the decision of the court? Certainly it is not an outside purchaser who is not yet known. Apparently it is the state as trustee, or the Board of Educational Lands and Funds or its agents. Their interest can be said to be adverse only by conceding that a high valuation will result in loss to the school lands. Who in the present case will be in a position to give evidence concerning the improvements and their value? Obviously the present tenants who with their ancestors have been in possession of the premises for 42 years. Who will be in a position to testify or make claim to the contrary? The board and its agents have changed from time to time. No one else will be interested.

Laws 1953, chapter 255, section 1, page 862, formerly section 72-240.06, R. R. S. 1943, is cited in the opinion of the court setting out the list of property which then passed on appraisement from the old tenant to the new. The list consists of buildings, fencing, wells, windmills, irrigation improvements, dams, drainage ditches, trees, plowing for future crops, and growing crops.

In cases considered by this court on appeal between tenants, the outgoing tenant was wont to equate the

worth of such improvements more to costs than to value. This perhaps arises because most of the cases involved growing small grain crops on the first of January. There was generally no market for them and it was difficult to say what their value was. The outgoing tenant testified to the costs of preparing the ground and sowing the grain and then generally placed a value corresponding with the costs. This testimony was permitted because costs do have some relationship to value. O'Neil v. Haarberg, 179 Neb. 531, 139 N. W. 2d 217.

In the list of properties set out there are many improvements, the value of which will be difficult to fix. Who knows the value of wells, irrigation improvements, dams, drainage ditches, and land leveling as they are separately related to the land on which they are placed? To do so it would be necessary to know the productivity of the lands involved before and after the improvements were effected. The Board of Educational Lands and Funds has been collecting cash rent and had nothing to do with the crops raised. The tenant occupied the premises under long-term leases and generally placed them there for his own profit or convenience during the term. He can testify as to the improvement of the premises, their costs, and value.

Trees are planted as small shoots. They were often procured free from the federal government. In this instance, costs are forgotten, but having grown from roots in the school lands they are said to be of great value. In the case of the windbreak, the land under it has little value where the windbreak is divorced from it and must be separately purchased.

I am fearful that with the means at hand to augment the value placed upon the improvements, any appraisal of them will become overvalued.

The court's opinion holds that prior to September 14, 1953, no written approval by the Board of Educational Lands and Funds was required for the installation of whatever enumerated improvements the tenant desired

to place upon the premises. It holds they are compensable regardless of whether they were only suitable for the lessee's personal needs or were required by the interests of good husbandry and the proper operation of the land. Motives for overimprovement were not lacking. First, they could be used in connection with the operation of nearby lands privately owned. Second, their presence often chilled bids at a subsequent leasing. Third, if a new tenant outbid the former tenant, he was assured that as long as the leasing arrangements were continued he would receive the value of the improvements. Juries were often inclined to accept the outgoing tenant's valuations.

Sections 72-257 and 72-258, R. S. Supp., 1965, providing for the sale of the school lands requires an appraisal of the land only for the sale purposes and provides that the premises be not sold for less than the appraisal. If a separate valuation of improvements is required to be paid, it is apparent that any excess of value over the appraisal that a bidder might be inclined to pay for the land would go to compensate the lessee. It is equally obvious that if the valuation of improvements is swollen the real value of the school lands would be seriously impaired. If the sum of the two appraisals exceeded the bid the sale would be blocked.

Why did not the Legislature provide for the appraisal of the improvements in the sections providing for sale? Surely an appraisal of many types of improvements would require that guidelines be supplied concerning depreciation as well as obsolescence which occurs not only to buildings but to other changes made in the land itself. In my opinion, no appraisal of improvements was required because the Legislature considered that the common law provided the sole remedy of the lessee with respect to his improvements when the premises were sold. The leasing is at an end. The special statutes governing solely the rights between the successive lessees end with it.

The statutes enacted by the trustee should not be construed as eroding the value of the trust property unless they clearly require such a determination. They do not do so here. Much less should this appellate court in an equity case in which it sits as a court of chancery and good conscience dealing with trust property permit itself by a strained interpretation to do so.

If the lessees of the state school lands are restricted to the removal of such of their improvements as can be done without injury to the freehold they will of course not receive as much as they had hoped, but in my opinion they will have received all that the law of the land entitles them to receive. I am not impressed by the opinion of the court which seems to infer that they would be badly treated and go "empty-handed." In the present case, the plaintiffs and their ancestors before them have leased these premises for 42 years. For the first 25 years they agreed to pay a little over 25 cents an acre a year as rent. For another lease for a period of 25 years, which however was executed before the end of the first term, they paid a little less than 25 cents an acre a year for their use. The record does not show what they have paid since. It was based upon an appraisal not in the record.

The record does show, however, that the lease rentals and penalty interest on the school lands under agricultural leases amounted to $4,798,436.09. This is for the biennium from July 1, 1962, to June 30, 1964. The record as previously stated shows these lands included more than 1,600,000 acres. The record further shows that the cash bonuses from the agricultural lease sales on the common school lands were $2,313,359.90 during this same biennium. The amount of these bonuses clearly shows that the rental of the lands involved were lower than they should have been and were based on appraisals that were inadequate. Otherwise such a great sum would not have been received in bonuses for either new or renewal leases. The improvements were

made, in my opinion, largely for the convenience and for profitable farming of those who held the premises under long-term leases. Their addition was not reflected in the rentals at least for years to come.

I would affirm the judgment of the trial court insofar as it purports to place the title to the improvements in the lessees. That was all the trial court did. That is all we were asked to do by either party. However, I realize that the court in its opinion felt that the far-reaching effects of its decision demanded that something be done to clarify the impending sales of these vast holdings. That being required, I would simply state that the lessees be permitted to remove such of their improvements as could be removed without damage to the freehold in accordance with the common law. Inasmuch as time-consuming litigation intervened between the end of the leasehold term and the present, I would have given them a reasonable period to do so.

I am authorized to announce that Spencer, J., and Colwell, District Judge, join in this dissent.

CARTER, J., concurring.

I agree fully with the holdings of the majority opinion. In view of the contentions advanced in the dissenting opinion, it seems necessary that they be answered and that the opinion of the court be clarified as it relates to such contentions.

It is argued that the common law of landlord and tenant controls certain phases of the case, particularly as it relates to the rule that improvements belong to the landlord at the termination of a lease in the absence of an agreement to the contrary. Since 1867, statutes regulating the selling and leasing of the public school lands of the state have been in force. The history of the legislation shows without much question that the legislative purpose was to encourage the making of such improvements to enhance the value of the public school lands for agricultural purposes. Over the years, the state has never assumed the cost or value of improve-

ments but has consistently sought to protect the interests of lessees in placing improvements on school lands during the terms of their leases. This protection has been afforded by requiring a new lessee to pay the old lessee for the latter's improvements located on the land. In case negotiations failed, the value was to be determined by a board of appraisers subject to a right of appeal to the courts. In any event, the new lessee was required to acquire and pay the old lessee for the improvements. The problem was confused during certain periods of its legislative history when the Legislature provided as an alternative that improvements could be removed by the old lessee within 6 months after the termination of his lease, a provision in conflict with the common law rule that improvements could be removed during the term of the lease if pursuant to an effective agreement. From time to time the Legislature defined the term "improvements" by adding new forms of land benefits which were not recognized as "improvements" within the common law rules applicable to landlord and tenant. The remedy provided by applicable statutes was a form of compensation, as compulsory as condemnation under eminent domain, if negotiation failed. The state claimed no interest in the improvements and affirmatively preserved a right in the lessee in improvements listed in the statutes. As an example, the Legislature at various times provided that the following were improvements: Irrigation improvements, dams, drainage ditches, plowing for future crops, conservation terraces, assessments paid to any irrigation district, trees, and sod breaking. None of these were recognized as improvements within the common law of landlord and tenant. The imposition of the value of improvements upon a new tenant is contrary to common law rule. I submit that the purpose, spirit, and public policy involved was in complete conflict with the common law of landlord and tenant, is in complete derogation thereof, and that the common law has no application to the issues

here raised. The rights or liabilities created and the remedies provided are wholly statutory and must be looked to for the solution of the problems before us.

At common law the landlord was the owner of improvements put on the land by the lessee unless an agreement was made for their removal as the property of the lessee and their removal was had during the term of the lease. But here the state has never had any interest in the improvements and has never claimed an interest therein. In fact, the state through legislation has continuously recognized the lessee placing improvements on school lands as having some sort of title or interest in them. The nature of this interest or title is an intriguing one. The lessee certainly does not have what we might term a fee title. He does not have the muniments of such a title under the statutes. He cannot remove improvements at will for the simple reason that many of them cannot be removed. He cannot sell to whom he pleases because his sale is limited to the successor lessee. He cannot demand his price because when negotiations fail he is forced to accept the remedy in existence when he placed them on these public lands, to wit, the appraised value or the amount fixed on appeal to the courts from the appraisement. The interest of the lessee is therefore a limited title or, what would probably be more accurate, a compensable interest in the improvements on the leased lands.

It is suggested in the dissenting opinion that the Legislature may rightfully invoke the common law rules relating to landlord and tenant, and allow the state to proceed to sell the improvements as its own. This cannot be done for two reasons: First, because the common law is not applicable, and, second, because a recognized compensable interest in a lessee to an incoming lessee cannot be treated as belonging to the state on a sale of the school lands without violating the constitutional requirements of due process. To hold that a lessee has a compensable interest in improvements on a new

lease to a third party and that he has no compensable interest on a sale to such third party would create a legal anomaly supported neither by logic nor legal sanction.

The dissenting opinion questions the authority of this court to restrain the sale of school lands until the interests of lessees in improvements have been determined. The issue thus raised is a very important one and requires further discussion and clarification. The public school lands of this state are held in trust for educational purposes. Art. VII, § 9, Constitution of Nebraska. The Constitution having provided that school lands are held in trust for educational purposes, the Legislature is required to administer the trust under the rules of law applicable to trustees acting in a fiduciary capacity. A breach of the duties and functions imposed upon the state through the Legislature as a trustee by virtue of its constitutional status as such is a violation of the Constitution itself. The Legislature is authorized to provide by statute the terms upon which the public school lands of the state may be sold, but such terms must be consonant with the duties and functions of a trustee acting in a fiduciary capacity. It is the duty and function of a trustee to avoid unnecessary risks of loss and at the same time to obtain a maximum return to the trust estate consistent with the avoidance of such risks. State ex rel. Ebke v. Board of Educational Lands & Funds, 154 Neb. 244, 47 N. W. 2d 520.

In the instant case, a tract of school land was offered for public sale. Included in the sale were the improvements on the land in which the state had no monetary interest. The sale of improvements by the state under such circumstances could well result in a loss to the state and a depletion of the trust funds. Such a sale amounts to a conversion of the improvements by the state. The sale by the state of the lessee's compensable interest in the improvements, the value thereof to be determined at some future time, could well result in

great benefit to the lessee and a corresponding loss to the trust fund. In the exercise of its power to protect the interests of beneficiaries of trusts, and particularly the beneficiaries of a public trust, the court is authorized and, I think, required to determine the method of sale in the instanst case be enjoined. To permit the continuance of such sale, and thus allow intervening rights of bidders and others to accrue, is not for the best interests of the trust. The sale of lands by the state along with improvements not owned by the state, especially before their value is determined, constitutes an unreasonable risk of depletion of the trust fund. The possibility of bid chilling, and other factors tending to reduce the return of the sale, is alone sufficient to warrant the intervention of a court of equity.

A requirement that the value of the improvements must be determined prior to a public sale of school lands immediately raises the question as to how it can be done. It would seem that the Board of Educational Lands and Funds has a sufficient interest, on a failure of negotiation, to have the issue determined in a declaratory judgment proceeding between the board and an outgoing lessee. Or the Legislature could provide a new remedy meeting the requirements of due process. The more important issue is the determination of the compensable interest of the lessee and the type of evidence required to support a judgment.

I am of the opinion that the cost of the improvements to the occupying lessee is generally of little evidentiary value, although it may constitute a maximum that may be recovered. The determination of the value of improvements on a cost basis overlooks depreciation, obsolescence, overimprovement, and a possible want of benefit to the land. Some of the improvements listed by the statute may be paid for in whole or in part by the government as a matter of public policy, and should not accrue to the benefit of the occupying lessee. Certainly any value added to the land itself, as distinguished from

the actual value of the improvements, is the property of the trustee. The compensable interest of the lessee should not be permitted to exceed the value of the improvements to the land at the time of the termination of the occupying tenant's lease. Compensation for improvements must be consistent with the overall purpose, spirit, and public policy involved. Any judgment which in effect invades the trust res cannot be sustained. An examination of the legislative history of the applicable statutes reveals that the Legislature never intended that the state would ever become liable for the cost or value of improvements or that the trust fund should become liable for any part thereof, directly or indirectly.

The dissent expresses a fear that the trust fund will be depleted because of the necessity of determining the value of the improvements before a sale of the school land on which they are located. The danger of a depletion of the value of the school lands or the amounts received from their sale is a matter of extreme concern to the majority as well as the minority. But to merely affirm the holding of the trial court that occupying lessees have a financial interest in the improvements and permit the public sale to continue will lead the state into possible loss to the state from which it cannot extricate itself. The state, then, will have sold the improvements which it does not own and obligate itself to the payment of whatever amount subsequent determination may develop. That such a subsequent determination may be in excess of any reasonable amount contemplated by the trustee is one of the fears that can be eliminated before sale only. The time to protect against such possible losses to the trust property is before the sale, and not after. The labyrinth of statutes on the subject, and the interpretations to which they are subject, is reason enough for a determination of rights before liabilities have been assumed. It seems to me that the protection of the trust res is the ultimate objective

of both the majority and the minority. The differences arise only in the manner of accomplishing this result.

I have the view that the problems must be largely determined before sale in order that the trustee will have an opportunity to determine their actual value; bidders will know with some certainty what they are buying; and occupying tenants will have their rights determined without the necessity of subsequent costly litigation. It is my opinion that, unless such a disposition is made, the entanglements will become more complex and, in all likelihood, with great loss to the common schools of the state. The scope of the powers of a court of equity over trusts has been stated as follows: "A court of equity has been said to have the capacity of a universal trustee. The scope of such judicial supervisory control includes, of necessity, any matter which concerns the integrity of the trust res—its administration, its preservation and its disposition, and any other matter wherein its officers (trustees) are affected in the discharge of their duties." 54 Am. Jur., Trusts, § 276, p. 219.

Some contention has been made that occupying lessees have had very advantageous lease agreements over the years and that this mitigates the interest of such lessees. That this has been permitted to occur cannot be disputed. But this does not mean that all lessees have profited at the expense of the trust in this manner. The rent paid on a lease and the amount due for improvements have no legal relation one to the other, and the low rent leases received by some cannot operate to the disadvantage of all lessees who have placed improvements on school lands in reliance on existing statutes.

It is my conclusion that the courts have a duty and responsibility to guard the public school lands, and the funds derived from their sale and rental, against loss. This duty includes any procedure which involves any unreasonable risk or leads the trustee into the expense of subsequent litigation. It is the duty of the state to avoid costly pitfalls that can result in the depletion of

the trust fund. The responsibility also rests upon the courts to see that the state performs its duty as a trustee. Since the majority opinion is consistent with these views, I support it as a correct disposition of the case before us.

Boslaugh and McCown, JJ., join in this concurrence.
SPENCER, J., dissenting.

I concur fully with the dissent of Judge Brower herein. I deem it necessary, however, to point out that except for the references to the trust character of school lands and a reference to the scope of the powers of a court of equity in 54 Am. Jur., Trusts, § 276, p. 219, with which I fully agree, the concurring opinion is wholly lacking in authority. I suggest this lack of authority buttresses the fact that the law is as set out in the dissenting opinion. If it could be successfully refuted, it would not be necessary to rely on mere assertions.

I believe it is important that we recognize the issue involved herein. We are not here concerned with the history of the school land legislation. We concede the legislative intent to grant rights to lessees in the improvements, but question its power to grant an interest of any nature in the land. This is the result unless the common law rule on improvements is applied. We are not concerned with rights as between lessees, but rather as to whether a trustee may grant rights to the detriment of his cestui que trust. It is the law of trusts which is controlling herein.

As set out in Propst v. Board of Educational Lands & Funds, 156 Neb. 226, 55 N. W. 2d 653: "The title to the state school lands was vested in the state upon an express trust for the support of common schools without right or power of the state to use, dispose of, or alienate the lands or any part thereof except as allowed by the Enabling Act and the Constitution."

The law applicable herein is well stated in State ex rel. Ebke v. Board of Educational Lands & Funds, 154 Neb. 244, 47 N. W. 2d 520: "A trustee acts in a representa-

tive capacity and persons dealing with him are bound to be cognizant of his powers. A trustee is required to dispose of trust property upon the most advantageous terms which it is possible for him to secure for the benefit of the cestui que trust whom he represents. The rule is no different in the leasing of property of a trust estate." In that same case, we said: "The state in acting as a trustee is subject to the same standards, and when its status as a trustee is fixed by the Constitution a violation of its duty as a trustee is a violation of the Constitution itself."

That the Legislature has the power to provide the method of administering the public school lands of the state as a trust is without question, but the method provided must be one which is within the law governing the administration of trust estates. The designation of these lands as a trust in the Constitution has the effect of incorporating into the constitutional provision the rules of law regulating the administration of trusts and the conduct and duties of trustees. A breach of trust in such a situation is in effect a violation of the constitutional provision and has the effect of invalidating the legislation authorizing the breach. State ex rel. Ebke v. Board of Educational Lands & Funds, *supra*.

The effect of the various acts referred to in the majority opinion is to confer special benefits upon the holders of leases of school lands to the detriment of the beneficiaries of the trust. This is the construction placed upon the statute by the majority and the concurring opinions when they require a determination of the value of the so-called improvements and in effect force the trustee to buy them before sale. It is my contention that the state is powerless to gratuitously create liens in any form on public school lands. I contend further that any lessee dealing with the state in its trust capacity is conclusively chargeable with knowledge of the extent of its power.

It seems elementary that a strict interpretation must

be placed upon all statutes, agreements, and proceedings for the protection of beneficiaries of our public school lands. This fact, it appears to me, is wholly ignored in both the majority opinion and the concurring opinion. The majority opinion holds that lessees have a property interest. The concurring opinion states: "From time to time the Legislature defined the term 'improvements' by adding new forms of land benefits which were not recognized as 'improvements' within the common law rules applicable to landlord and tenant. The remedy provided by applicable statutes was a form of compensation, as compulsory as condemnation under eminent domain, if negotiation failed." I have no quarrel with these holdings when interpreting rights as between lessees. As I interpret the improvement statutes, they contemplate, and I believe can only contemplate, the relationship between the old and the new lessees. The state merely serves as an intermediary between the two lessees. I seriously disagree with any interpretation that would grant lessees any "land benefits" as against the trust, for the simple reason that the Legislature is without power to create or grant such benefits. What the majority opinion does is to diminish the value of school lands by substituting the state for a new lessee. This is not only judicial legislation, but also legislation in violation of a constitutional prohibition.

On the issue of the growing crop, the majority opinion in addition violates the express terms of the lease, which provides, "that the premises will be surrendered at the expiration of the lease." Lessees herein planted 25 acres of wheat in the fall in 1965, subsequent to the passage of the school land sales law, and at a time when the lease by its terms would expire December 31, 1965, or long before the crop could mature.

As the majority opinion states, at common law a tenant is not entitled to crops after the expiration of a lease. In Peterson v. Vak, 160 Neb. 450, 70 N. W. 2d 436, 51 A. L. R. 2d 1221, this court held that a lessee

has an absolute right to plant crops or use the land until the lease expires, but that he is chargeable with knowledge that any crop which has not matured by the termination of the lease would be his loss. The majority opinion, ignoring this case and the express terms of the lease, holds that in the interest of good husbandry this rule should not apply. The obvious effect of the majority opinion is to give the lessees a lien on the land for the crop which matured 6 months after the expiraion of the lease, when they deliberately planted it knowing the land was to be offered for sale.

For the reasons given, I cannot agree with the majority opinion herein.