IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

RAINWOOD ONE V. INTERSYSTEMS INTERNATIONAL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RAINWOOD ONE, LLC, A NEBRASKA LIMITED LIABILITY COMPANY, APPELLANT,

V.

INTERSYSTEMS INTERNATIONAL, INC., A DELAWARE LIMITED LIABILITY COMPANY, FORMERLY
KNOWN AS ENDURO SYSTEMS, INC., A TEXAS CORPORATION, APPELLEE.

Filed January 27, 2026.    No. A-25-110.

Appeal from the District Court for Douglas County: JEFFREY J. LUX, Judge. Affirmed.

Frederick D. Stehlik and John Andrew McWilliams, of Gross Welch Marks Clare, P.C.,
L.L.O., for appellant.

Michael T. Eversden and Lauren R. Goodman, of McGrath North Mullin & Kratz, P.C.,
L.L.O., for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

This case involves a landlord-tenant dispute between Rainwood One, L.L.C. (Rainwood),
and Intersystems International, Inc. (Intersystems), formerly known as Enduro Systems, Inc.
Rainwood leased property to Intersystems, and each party purchased and installed overhead bridge
cranes in the buildings to be used by Intersystems in its manufacturing operations. When the lease
was ending, Intersystems sought to remove the overhead bridge cranes it had purchased and
installed, claiming they were trade fixtures, and thus removable under the parties' lease agreement.
Rainwood claimed that the overhead bridge cranes purchased by Intersystems were fixtures and
had become the property of Rainwood.

Rainwood brought a lawsuit against Intersystems that included causes of action for breach of contract and conversion. After the parties submitted the matter on a stipulated record, the Douglas County District Court found that the overhead bridge cranes purchased and installed by Intersystems were Intersystems' trade fixtures and were removable under the terms of the parties' lease. The district court entered judgment in favor of Intersystems. Rainwood appeals. We affirm.

## II. BACKGROUND

This case centers on a landlord-tenant dispute between Rainwood and Intersystems. Other entities were initially involved in the lease, but after several amendments, only Rainwood and Intersystems remained parties to the lease.

### 1. LEASE AGREEMENT

From February 2008 to April 2022, Intersystems leased industrial property in Omaha, Nebraska, from Rainwood. The original lease was signed in February 2008, and the parties subsequently amended the lease multiple times. Unless otherwise specified, the lease and amendments will collectively be referred to as the "Lease Agreement." The leased premises ultimately consisted of a "South Building," an addition to the South Building, and a "North Building." As stated in the Lease Agreement, the premises were leased to Intersystems for "a [m]anufacturing operation and ancillary office, warehouse and storage uses, and for no other purpose."

The original lease required Rainwood to make certain "Base Improvements" to the South Building as more specifically identified in an exhibit to the lease; those base improvements included upsized footings to anticipate eight "bridges overhead crane[s]" of specified ton capacities, and a $500,000 allowance for "overhead crane purchase and installation." Pursuant to the second amendment to the lease, the overhead crane system was to be installed by the landlord (Rainwood) as part of the improvements, and the existing approved facility plans and specifications included the crane system support plans and a purchase order with Kistler Cranes. There is no dispute that Rainwood purchased and installed eight Kistler cranes in the South Building, and that it owned those eight cranes.

Pursuant to the sixth amendment to the lease and exhibit A attached thereto, when Rainwood agreed to construct an addition to the South Building, the agreement called for the "[s]ame structural steel system as . . . current building . . . columns and footings already designed for overhead cranes." However, there was "[n]o allowance for any cranes or installation."

Intersystems purchased and installed two UESCO cranes in the South Building/addition and eight UESCO cranes in the North Building. Intersystems eventually sought to remove the UESCO cranes that it had purchased and installed.

The Lease Agreement permits Intersystems to remove trade fixtures, but other improvements, additions, or alterations become part of the premises and the property of Rainwood. Specifically, paragraph 8 of the original lease agreement provides, in relevant part:

> **TENANT'S IMPROVEMENTS**. TENANT shall have the right to place partitions and fixtures and make improvements or other alterations in the interior of the Premises at its own expense. Except in respect to Permitted Alterations as defined below . . . TENANT shall first obtain the written consent of LANDLORD for the proposed work . . . . For

purposes hereof, the following constitute "**Permitted Alterations**" for which LANDLORD's consent is not required: (i) cosmetic alterations . . ., (ii) fixturing with TENANT trade fixtures such as shelves, racks and bins, and (iii) the first $20,000.00 of non-structural alterations made by TENANT in a single year . . . [.] In the case of Permitted Alterations, TENANT will instead notify LANDLORD of the proposed work before it is commenced . . . [.] Upon termination of this Lease, all such improvements, additions or alterations installed or made by TENANT, except TENANT's trade fixtures and items TENANT specified at the time of LANDLORD's approval were to be deemed TENANT removable property, shall become part of the Premises and the property of the LANDLORD. TENANT may remove its trade fixtures at the termination of this Lease provided that TENANT repairs any damage caused by such removal.

While Intersystems claimed the UESCO cranes were trade fixtures, and thus removable property, Rainwood claimed the cranes were fixtures that became part of the premises and were its (Rainwood's) property.

## 2. RAINWOOD'S LAWSUIT AGAINST INTERSYSTEMS

Rainwood filed a complaint against Intersystems on September 14, 2021, and an amended complaint on September 29, 2022. Rainwood alleged several causes of action, including (1) breach of contract, (2) conversion, and (3) temporary and permanent injunction. These were the only three causes of action related to Intersystems' removal of the cranes from the leased property. (Other causes of action related to parking lot repairs, unpaid rents, and a damaged heater are not at issue on appeal.) In addition to the temporary and permanent injunction, Rainwood sought money damages. Also on September 14, 2021, Rainwood filed a motion for a temporary restraining order and preliminary injunction prohibiting Intersystems from removing the cranes. The district court granted the temporary restraining order the next day, but after a subsequent hearing on the matter, the restraining order was dissolved and the motion for preliminary injunction was denied.

The parties ultimately agreed to submit the matter to the district court upon a stipulated record. On October 9, 2024, the parties entered a "Stipulation and Order" stating their agreement to submit the matter to the court on the written record. Rainwood offered exhibits 14 through 57, and Intersystems offered exhibits 58 through 93; all exhibits were to be received by the court. Each party was to submit "Findings of Fact and Conclusions of Law" to the court, along with a copy of all deposition transcripts on which they relied in their findings of fact. The parties' respective findings of fact, conclusions of law, and designated deposition testimony were to be considered as each party's trial submission. Upon receipt of the trial submissions, the court reporter was to mark all deposition transcripts as trial exhibits for purposes of the written record. Thereafter, the court would take the matter under advisement. The court later approved the parties' stipulation.

## 3. RECORD SUBMITTED TO DISTRICT COURT

Many of the exhibits and most of the deposition testimony related to Rainwood's causes of action that are not at issue on appeal. We therefore only discuss evidence relevant to the cranes.

Among the evidence relevant to the cranes was the Lease Agreement, photos of the overhead crane system, work order invoices, deposition testimony from Scott Seaton (designated

deponent for Rainwood), an email exchange between Seaton and representatives of AGCO/Intersystems regarding the cranes, and the affidavit of Shane Keifer (project manager for the removal of the UESCO cranes).

### (a) Lease Agreement

To the extent not previously set forth, relevant portions of the Lease Agreement will be further discussed as necessary later in our analysis.

### (b) Seaton Deposition Testimony

Seaton testified that he was Rainwood's "Manager." Rainwood owns the building that AGCO/Intersystems was renting. Rainwood was created to "build the building for Intersystems." Seaton "was the one that worked with . . . Intersystems in designing and putting together . . . a new building for them," "[d]id the design, negotiated . . . everything they needed and this and that and the lease rates, et cetera." Rainwood owns a "south" building and a "north" building that were leased to Intersystems.

Seaton confirmed that Rainwood purchased and installed eight Kistler cranes in the South Building to satisfy its obligation under the original lease; Rainwood insured the Kistler cranes. Intersystems purchased additional cranes and installed them in the South Building addition. Seaton said, "I had to provide the support rails and the steel support structures for those and the electrical," but "they bought cranes for those because I told them I wasn't going to do it again." Seaton "[didn't] recall" whether Rainwood insured the cranes purchased by Intersystems. According to Seaton, Intersystems also purchased the cranes that went into the North Building. Rainwood paid for the electrical system and the rails on which the cranes ran, but there was not an allowance for the cranes. Seaton "[didn't] know" if Rainwood paid for insurance on the cranes in the North Building.

Seaton confirmed Intersystems paid for the UESCO bridge cranes and hoists, but Rainwood paid for the footings, support columns, and beams. Seaton's understanding was that the cranes and hoists "would stay since I paid for all the other supports for those." When asked for the basis of his understanding, Seaton replied, "Well, there's not a whole lot of benefit for me to be paying for the other stuff if I don't end up with cranes to stay on them if they ever move out, but I was assured that they were going to be there for a long time." Seaton acknowledged that he could install additional cranes at any time by just buying them. Seaton "believe[d]" he had an express agreement that the cranes purchased by Intersystems would become Rainwood's property at the expiration of the lease; the parties to the communication were "probably Tom Schroeder and/or one of the other guys that were there, that worked there," "Kurt, I think." That communication was "[t]en years ago," "probably during the negotiation for doing the addition and/or the north building." When asked who would have been present during the conversation, Seaton replied, "I don't know," "[i]t may have been just the two or three of us." When asked why that understanding was not reflected in the lease, Seaton replied, "Don't know," "[c]ould have been shortsighted on my part." Seaton did not have anything in writing with any representative of Intersystems that confirmed his understanding.

According to Seaton, the crane sits on a rail, and "[t]here's holders that keep it from coming off"; the holders are "part of the crane," "the bridge portion." Additionally, there are electrical

connections. In Seaton's opinion, the cranes are "part of the craneways, the bridge cranes, they're all a -- part of the unit that is attached -- or that is part of the building itself."

Seaton confirmed that the removal of the cranes did not cause physical damage to the property. "The damage basically is . . . that now all of a sudden I have a building that does not have overhead cranes in it but does have craneways . . . that are obstructions for people who would normally want to use the building for something other than manufacturing but yet incomplete for someone who would want to then use the building for manufacturing, which is what it was built for."

The eight Kistler cranes that Rainwood purchased were left with the property. When asked if Rainwood could have acquired additional cranes to replace the UESCO cranes that were removed by Intersystems, Seaton replied, "Yes," as a "[m]atter of fact, [Rainwood] did"; "I acquired three of the [UESCO] cranes that were still there, they were actually on the auction." Seaton did not know the capacity of the three cranes he purchased, but said he paid "$70-some-thousand" for the three of them and they remain in the North Building.

Seaton testified that Rainwood has re-leased the office portions of the South Building to a construction company. The balance of the property was being leased to a storage company. According to Seaton, the storage company was not using the cranes purchased from Intersystems (which were still in the building) because Rainwood "[h]as the controls for them."

### (c) Email Exchange

In a July 2021 email, Seaton informed an individual from "AGCO" that "the north building was built with Rainwood . . . paying for all the crane ways, but we insisted on Intersystems paying for the bridge cranes and hoists directly"; "[h]owever, it was always understood that the bridge cranes would stay as part of the building fixtures since we paid to accommodate and incorporate them into the building design." A response was sent to Seaton in August stating the cranes purchased by AGCO were not included in the lease and "[w]e intend to begin moving the AGCO-owned cranes shortly."

### (d) Kiefer Affidavit

In his affidavit, Kiefer stated that his company removed three of the UESCO cranes on September 13 and 14, 2021. He explained:

> In order to remove the crane, it is detached from the electrical system with the simple loosening of two pressure bolts. Once the Bridge is detached from the electrical system, a large scissor lift is used to raise the Bridge off the runway rails. The lift then turns the Bridge and positions it so that it can be lowered to the ground without any contact with the runway or any other part of the building.

According to Kiefer, "[i]t took approximately two hours . . . to detach and lower each crane," and "[t]here was no damage to the runway or any other part of the . . . building as a result of the removal of the cranes."

## 4. DISTRICT COURT'S RULING

On December 5, 2024, the district court entered its "Order on Stipulated Bench Trial." The court entered judgment in favor of Intersystems and dismissed Rainwood's claims. With respect to the UESCO cranes, the court found that Intersystems did not breach the Lease Agreement when it removed any of the UESCO cranes because the cranes were trade fixtures, and thus removable under the terms of the Lease Agreement. Additionally, because the UESCO cranes were trade fixtures that belonged to Intersystems, Rainwood was not entitled to relief on its claim for conversion. Rainwood's motion to alter or amend the judgment was denied after a hearing.

Rainwood appeals.

## III. ASSIGNMENTS OF ERROR

Rainwood assigns, consolidated and restated, that the district court erred by (1) finding the UESCO cranes were trade fixtures and therefore the removable property of Intersystems, (2) applying the parol evidence rule to bar the parties' communications regarding their intention as to the UESCO cranes, and (3) dismissing Rainwood's claims for breach of contract and conversion.

## IV. STANDARD OF REVIEW

The determination of rights under a contract is a law action. *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010).

In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, which an appellate court will not disturb on appeal unless clearly wrong. *PSK v. Legacy Outdoor Advertising*, 318 Neb. 1, 13 N.W.3d 81 (2024). And an appellate court does not reweigh the evidence but considers the judgment in the light most favorable to the successful party. *Id.*

The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review. *Brush & Co. v. W. O. Zangger & Son*, 314 Neb. 509, 991 N.W.2d 294 (2023).

Whether an article annexed to the real estate has become a part thereof is a mixed question of law and fact. *PSK v. Legacy Outdoor Advertising, supra*. See, also, *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015).

The applicability of the parol evidence rule is a matter of law, for which we have an obligation to reach a conclusion independent of the lower court's decision. *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010).

## V. ANALYSIS

### 1. WERE UESCO CRANES TRADE FIXTURES?

The principal question in this appeal is whether the UESCO cranes were fixtures or trade fixtures. Rainwood claims that the district court "misapplied the evidence to Nebraska's longstanding test for determining whether articles qualify as fixtures or trade fixtures." Brief for appellant at 17.

Fixtures are usually thought of as personal property which has become a part of the real estate, but a trade fixture is defined as personalty. *Griffith v. Drew's LLC, supra*. Trade fixtures are articles annexed to the realty by a tenant for the purpose of carrying on trade and are ordinarily removable by him during his term. *Id.* Determining whether an item is a fixture or a trade fixture

can be a difficult task, and "'what constitutes a "trade fixture" depends on the facts of the particular case.'" *Id.* at 518, 860 N.W.2d at 760 (quoting 36A C.J.S. *Fixtures* § 37 at 316 (2014)). As between a tenant and a landlord, the evidence should be construed liberally in favor of the tenant. *Frost v. Schinkel*, 121 Neb. 784, 238 N.W. 659 (1931).

(a) Three-Part Test

The Nebraska Supreme Court has established a three-part test to assist in the determination of whether an article annexed to real estate has become a part of the real estate. See *Griffith v. Drew's LLC, supra*. In determining the question, a court should consider (1) actual annexation to the realty or something appurtenant thereto, (2) appropriation to the use or purpose of that part of the realty with which it is connected, and (3) the intention of the party making the annexation to make the article a permanent accession to the freehold. *Id.*

*(i) Annexation*

As to the actual annexation to the realty or something appurtenant thereto, both Seaton's deposition testimony and Kiefer's affidavit are relevant. Seaton testified that the crane sits on a rail, and "[t]here's holders that keep it from coming off"; the holders are "part of the crane," "the bridge portion." Additionally, there are electrical connections. (Rainwood provided the support rails, the steel support structures for the cranes, and the electrical components in the buildings.) In his affidavit, Kiefer stated that in order to remove the crane, it is detached from the electrical system with the simple loosening of two pressure bolts, and "[o]nce the Bridge is detached from the electrical system, a large scissor lift is used to raise the Bridge off the runway rails." The process to detach and lower each crane took about 2 hours, and the removal of the cranes resulted in no physical damage to the premises.

Rainwood claims that the district court "disregarded Rainwood's contention that the property would be less marketable without the cranes." Brief for appellant at 26-27. However, Seaton's deposition testimony revealed that it had re-leased the property that was the subject of the Lease Agreement with Intersystems. A construction company leased the office portion of the South Building, and a storage company leased the "balance of the property." According to Seaton, the storage company was not using the cranes purchased from Intersystems (which were still in the building) because Rainwood "[h]as the controls for them."

*(ii) Appropriation*

"'The second part of the test focuses on whether a chattel is specific to the type of business conducted on realty, or on whether it is the type of property that would generally be found on realty and that would have utility to a hypothetical purchaser of the underlying realty.'" *Griffith v. Drew's LLC*, 290 Neb. at 519, 860 N.W.2d at 760 (quoting 35A Am. Jur. 2d *Fixtures* § 34 at 708 (2010)). Here, there is no dispute that the Kistler and UESCO cranes were used in Intersystems' manufacturing operations. And Rainwood constructed or made improvements to the buildings to accommodate the cranes (e.g. structural steel system, columns, and footings).

*(iii) Intent*

The third factor, regarding the intent of the annexing party, is given the most weight. *Federal Land Bank of Omaha v. Swanson*, 231 Neb. 868, 438 N.W.2d 765 (1989). Intention is

inferred from the nature of the articles affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made. *See Griffith v. Drew's LLC, supra.*

Here, Rainwood leased the buildings to Intersystems for use in its manufacturing operations, and Rainwood constructed or made certain improvements to the buildings to accommodate cranes used in the manufacturing operations. The UESCO cranes sat on rails and had holders that kept them from coming off the rails. The cranes were also connected to the buildings' electrical system. Detachment from the electrical system required loosening two pressure bolts, and once the crane was detached from the electrical system, it could be lifted off the rail by a scissor lift. As previously indicated, the process to detach and lower each crane took about 2 hours. Rainwood argues that the "ease with which Intersystems removed the cranes was not dispositive," brief for appellant at 25, and the "trial court's reliance on the purported absence of physical damage to the Leased Premises was clear error," *id*. at 27. However, we agree with Intersystems that it was a "key factor in the law of fixtures and trade fixtures" to consider, brief for appellee at 17, particularly when determining whether a party intends to make the article a permanent accession to the freehold. See *Griffith v. Drew's LLC, supra.*

Additionally, we note that, as stated in paragraph 15(b) of the original lease, Rainwood was required to "maintain insurance against loss or damage to the Improvements . . . in an amount equal to the full insurable replacement cost of the Improvements (excluding coverage of TENANT's personal property and trade fixtures and any alterations added by TENANT unless the same constituted replacement of elements that were constructed by LANDLORD as part of the Improvements). . . ." Rainwood insured the Kistler cranes it purchased, but Seaton either did not recall or did not know whether Rainwood insured the cranes purchased by Intersystems.

### (b) Parol Evidence

Rainwood argues that the district court erred in applying the parol evidence rule to bar the parties' communications regarding their intention to affix the UESCO cranes to the property. Rainwood specifically points to "Seaton's testimony on conversations between the parties regarding the UESCO cranes" and "an email from Seaton to Intersystems regarding these conversations." Brief for appellant at 21.

In his deposition, Seaton testified to his understanding that the cranes would stay with Rainwood, based on communications he had with a person or persons from Intersystems "[t]en years ago," "probably during the negotiation for doing the addition and/or the north building." When asked why that understanding was not reflected in the lease, Seaton replied that "[c]ould have been shortsighted on my part."

The district court found that Seaton's testimony as to any oral communications or agreements with representatives of Intersystems that the UESCO cranes would become Rainwood's property "lacks any kind of detail and is unconvincing." The court further found that the parol evidence rule barred any evidence of such oral communications, "even if these were had."

The parol evidence rule states that if negotiations between the parties result in an integrated agreement which is reduced to writing, then, in the absence of fraud, mistake, or ambiguity, the written agreement is the only competent evidence of the contract between them. *R & B Farms v.*

*Cedar Valley Acres*, 281 Neb. 706, 798 N.W.2d 121 (2011). This rule gives legal effect to the contracting parties' intention to make their writing a complete expression of the agreement that they reached, to the exclusion of all prior or contemporaneous negotiations. *Id.* The parol evidence rule operates only between parties to such instrument and those claiming under them. *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010).

The parties' Lease Agreement contained the following provisions. Paragraph 28(b) of the original lease states, "This Lease contains the entire agreement between the parties and may be amended only by subsequent written agreement, signed by both parties." And paragraph 8 of the sixth amendment to the lease states, in relevant part, "Any prior discussions, negotiations or alleged agreements regarding amendments to the Lease are superseded and merged out of existence by the terms of this Sixth Amendment."

The Lease Agreement was an integrated agreement reduced to writing, and there is no evidence of fraud, mistake, or ambiguity. Accordingly, the written Lease Agreement is the only competent evidence of the contract between Rainwood and Intersystems. The Lease Agreement permitted Intersystems to remove its trade fixtures. To the extent Seaton's deposition testimony about oral communications with Intersystems was meant to show that the cranes were fixtures and not trade fixtures, we cannot say that the district court was clearly wrong in finding that such testimony lacked detail and was unconvincing. See *PSK v. Legacy Outdoor Advertising*, 318 Neb. 1, 13 N.W.3d 81 (2024) (trial court's factual findings have effect of jury verdict, which appellate court will not disturb on appeal unless clearly wrong).

### (c) Final Determination

Viewing the evidence in the light most favorable to Intersystems, we see no clear error in the district court's determination that UESCO cranes were trade fixtures and were removable under the terms of the parties' Lease Agreement.

### 2. NO BREACH OF CONTRACT OR CONVERSION

Because the UESCO cranes constituted trade fixtures and were thus Intersystems' removable property under the terms of the Lease Agreement, Intersystems was not in breach of contract when it removed any of those cranes. Additionally, because the UESCO cranes were Intersystems' property, Rainwood did not prove its cause of action for conversion. See *United Gen. Title Ins. Co. v. Malone*, 289 Neb. 1006, 858 N.W.2d 196 (2015) (to maintain action for conversion, plaintiff must establish right to immediate possession of property at time of alleged conversion).

### VI. CONCLUSION

For the reasons stated above, we affirm the order of the district court entering judgment in favor of Intersystems.

AFFIRMED.